In the Matter of Richie Douglas HAILEY.

No. 49S00–0009–DI–560.

Supreme Court of Indiana.

Aug. 8, 2003.

Ron Elberger, Judy L. Woods, Bose McKinney and Evans, Indianapolis, IN, for the Respondent.

Donald R. Lundberg, Executive Secretary, Indianapolis, IN, for the Indiana Supreme Court Disciplinary Commission.

## DISCIPLINARY ACTION

PER CURIAM.

In collecting a contingent attorney fee from a client's settlement, attorney Richie Douglas Hailey retained a fee in excess of the amount justified by the percentage provided in his written agreement with his clients. We find today, therefore, that his fee was unreasonable. We also find that the respondent failed timely to provide the client with a written settlement disbursement summary, delayed payment to medical and other third-party creditors, and shared a portion of his fee with another lawyer who was not a member the respondent's law firm in a manner not permitted by the *Rules of Professional Conduct.* Because this is the first instance of discipline for a violation of this type and because the respondent's services in achieving a settlement for his client were effective despite his failure to be diligent in wrapping the matter up, we impose only a public reprimand. Future violations of this nature may result in more severe sanctions.

 This matter comes before us upon the hearing officer's tendered report, generated after a full evidentiary hearing. The hearing officer concluded that the respondent violated the *Rules of Professional Conduct* as charged. The respondent has petitioned this Court for review of those findings and conclusions, pursuant to Ind.Admission and Discipline Rule 23(15), urging us not to adopt the hearing officer's findings of misconduct. Where the hearing officer's report is challenged, we review the record presented *de novo.* Final determination as to misconduct and sanction rests with this Court. *Matter of Lamb,* 686 N.E.2d 113 (Ind.1997); *Matter of Gerde,* 634 N.E.2d 494 (Ind.1994).

## I. The Facts

The respondent was admitted to the practice of law on October 9, 1974, and practices law in Indianapolis. In 1992, a 13 year-old boy was seriously injured in Indiana while riding as a passenger in an automobile. He incurred several hundred thousand dollars in medical expenses and is confined permanently to a wheelchair. Shortly after the accident, the boy's mother spoke with relatives, who suggested she contact the boy's uncle, who was a lawyer in Alabama, but did not handle personal injury matters. The uncle obtained the

respondent's name from a friend and fellow Alabama attorney, and gave it to the mother.

The boy's father was generally aware that the uncle had consulted with another Alabama attorney before the uncle recommended the respondent. The mother and boy were not aware of the consultation. The Alabama attorney and the parents each independently contacted the respondent, but had no direct contact with each other. In January 1993, the respondent agreed to represent the parents and the boy (collectively the "clients") on a contingent fee basis and the respondent drafted a written contingent fee agreement which was executed by the clients on January 14, 1993. The agreement provided, in relevant part, "[I]f the matter is settled or tried after One Hundred Eighty (180) days after suit, the client will pay at a rate of Forty percent (40%) of the gross amount recovered." Expenses of pursuing the claim were to be paid by the clients. The respondent did not include in the contingent fee agreement any provision that specifically addressed how his attorney fee would be calculated in the event of a "structured settlement" that included future periodic payments. The respondent's written fee agreement also did not disclose the division of attorney fees with the Alabama lawyer specifically, nor did it address generally the subject of division of fees with a lawyer not associated with the respondent's law firm. The respondent did not provide the clients with a copy of the agreement.

In November 1993, the respondent filed suit in an Indiana court on behalf of the clients against the driver of the vehicle in which the boy was riding at the time of the accident, the owner of the vehicle, the automobile manufacturer, and others. Throughout the litigation, the clients were in frequent contact with the respondent.

The father also spoke to the uncle about the case from time-to-time, and raised questions about certain aspects of the case. The uncle in turn talked to the Alabama attorney before responding, but the father never spoke to the Alabama attorney about the case and the mother and boy remained unaware that the Alabama attorney had any role in the matter.

In November 1997, the clients, the respondent, representatives of various defense insurers, and counsel for the defendants in the case met in two mediation sessions. At least by that time, the respondent was aware that a structured settlement was a likely option. As the discussion focused on a proposal to settle for a lump sum plus an annuity, the clients were concerned whether the lump sum would be sufficient to pay the boy's medical expenses, attorney fees, and litigation expenses. They thought it would be best to leave the annuity unencumbered for the boy's future expenses. To evaluate a structured settlement proposal they needed to know the dollar amount required for both the boy's medical providers and for attorney fees. In particular, the clients did not know what several medical providers would be willing to accept in satisfaction of their claims or how the respondent's attorney fee was to be calculated in the event of a structured settlement.

The defendants were accompanied at the second session by a broker experienced in purchasing annuities to fund structured settlements. For the first time the clients and the respondent discussed various methods by which the respondent's attorney fee might be calculated under a structured settlement. A copy of the written fee agreement was not available and the respondent did not give the clients a definitive answer to the calculation of his fee. Among the methods discussed during the second mediation session was a proposal

whereby the respondent would retain 40% of the lump sum cash payment and 40% of the gross amount of future guaranteed payments to be made to the boy, undiscounted to present value. The father concluded that, under this method, the respondent's fee and the medical expense payments would consume the lump sum payment and leave the boy owing additional attorney fees. By this time medical expenses were estimated at less than $400,000. The respondent ultimately agreed in writing with the clients prior to settlement that his maximum fee would be $1.6 million. The clients and respondent both intended that $1.6 million was a maximum, not the agreed amount of the fee.[1] With the respondent's attorney fee capped at $1.6 million, and the knowledge that the total amount of medical and related expenses was less than $400,000, the clients negotiated for an annuity without concern that the cash portion of the settlement would be inadequate to cover the medical and legal expenses.

The second mediation session resulted in a settlement. Its terms called for an initial lump sum payment of $2 million cash, plus periodic future payments of $80,000 per year compounding annually at 1.5%, beginning December 29, 1998 and lasting for the longer of the balance of the boy's life or 40 years. Pursuant to the settlement agreement, on December 3, 1997, the defendants purchased an annuity for the boy's benefit for a single premium of $1,465,698. That price, which was $28,818 less than the quote provided on November 29, 2003, was not reported to the respondent or the clients and they made no inquiry.

Under the 40–year guarantee, the boy will receive a minimum gross total payout of $4,341,431.29. The annuity was issued by a life insurance company and backed by the irrevocable guaranty of a second life insurance company. If the boy lives beyond the fortieth annual payment, he will continue to receive payments as scheduled until he dies.

In mid January 1998, the respondent received the initial cash payment of $2 million from the defendants and deposited it into his trust account. Fairly early in the case the respondent and the Alabama attorney had agreed that the Alabama attorney would receive one-third of the respondent's fee. On January 21, 1998, the respondent issued checks from his trust account in the amount of $1,066,666.66 to his law firm and $533,333.33 to the Alabama lawyer for a total of $1.6 million attorney fees. The respondent did not notify the clients that he was paying the fees or that one-third of the fee was being paid to the Alabama attorney. The father was aware before the mediation sessions that a referral fee would likely be paid to the uncle, but he had no indication as to the amount. Neither the mother nor the boy knew that a referral fee would be paid. On November 3, 1995, the respondent wrote a letter to the Alabama attorney in which, for the first time, he placed in writing his understanding that he would share the fees with the Alabama attorney.[2]

---

1. The clients testified that they did not know the basis for the fee of $1.6 million, but that they remembered the agreement with the respondent to cap his fee at $1.6 million. The respondent testified that the $1.6 cap was agreed to at a point during the settlement negotiations, but before the final settlement amount was known.

2. That letter stated in pertinent part:
"Please accept my apologies for not sending you a written confirmation as to our fee arrangement prior to this date.... I took a look through all correspondence, and did not find where I ever sent you a letter confirming our agreement. However, I did find a note indicating what our agreement was. Customarily, our office agrees to take primary responsi-

The respondent did not provide a copy of this letter to the clients.

In mid-February 1998, the respondent withdrew from his trust account an additional $24,837.63 to reimburse his law office for various expenses of the litigation. The respondent did not notify the clients of the withdrawal and did not provide them with an accounting showing the items that were being reimbursed. There is no claim that the amounts were improper. The respondent retained the balance of the settlement funds in his trust account to pay the medical creditors and health insurers who held subrogation interests in the settlement.

At the mediation, the clients had directed the respondent to negotiate with medical providers to attempt to reduce their claims. Between February 16 and October 28, 1998, the respondent made several partial distributions to the clients, totaling $80,000. Throughout 1998, the mother became increasingly concerned that her health insurers and various medical providers had not been paid. In some instances, the creditors contacted her directly. She made several unsuccessful efforts to contact the respondent's office about payment of these bills.

On October 7, 1998, almost nine months after settlement was closed, the mother sent a note to the respondent asking him to complete the distribution of the settlement funds within the next two weeks because she had been deferring a necessary surgical procedure until the distribu-

tions were complete. The clients sent a similar letter on October 23, 1998. In late October 1998, the clients finally hired an attorney to assist them in getting the respondent's cooperation in distributing the settlement proceeds. On November 4, 1998, the clients' attorney wrote to the respondent noting his representation of the clients and asking for a copy of the written contingent fee agreement, an accounting of the settlement funds, and a status report of any outstanding medical or subrogation claims. The respondent did not reply, and on December 3, 1998, the clients' attorney renewed his request. Following the second request, the respondent began paying the medical claims. Between December 8, 1998 and January 23, 1999, the respondent paid a total of $282,189.87 from his trust account to four medical creditors and subrogated insurers. The only medical bill the respondent paid before December 1998 was a subrogation claim of one of the mother's insurers. This was paid on August 18, 1998 only after respondent was threatened with legal action by an attorney representing the collection agency for the insurer's subrogation interest. Payment of the medical claims was complicated by several factors. The applicable medical insurance changed over time, and different insurers covered different items and had different co-pays and deductibles. Bills submitted by medical creditors included duplications, billing errors, and unauthorized charges. Some were subject to Indiana's hospital lien statute (I.C.32–8–26–4(a)(6)); some were subject to the subrogation statute (I.C.34–53–

bility for the processing of the litigation against all named defendants, and settlement and resolution of all subrogation claims. We also agree to be responsible for 100% of all litigation expenses, subject only to reimbursement, in the event the litigation is successful. Obviously, this litigation expense reimburse-

ment will come from the client's share. Further, we agree that any attorneys' fees realized will be split on the basis of 2/3rds to our office, and 1/3rd to yours. The 1/3rd that is paid to your office is characterized as co-counsel fees to you."

1-2), and others were subject to neither. The respondent ultimately negotiated discounts and reductions of approximately $115,793.01 from the original medical expense claims. Despite those difficulties, the delay was for the most part due to respondent's failure to resolve those claims.

On December 11, 1998, approximately eleven months after he received the settlement proceeds, the respondent first reported to the clients and their attorney the distributions he had made from the settlement proceeds. He did not report that he had distributed in excess of $1,624,000 for expenses of litigation and attorney fees. The clients' new attorney wrote to the respondent on January 25, 1999. In addition to pointing out several claims for medical services that appeared to remain unpaid, he renewed the mother's request for a copy of the contingent fee agreement and a full accounting for the funds received in settlement. On April 30, 1999, the clients' attorney again asked for documentation that all of the medical creditors had been paid and reminded the respondent of his earlier unsatisfied request for a copy of the fee agreement and an accounting of distributions. The clients' attorney again renewed that request on June 3, 1999. On June 10, 1999, five months after he had paid the last medical creditor, the respondent provided the client's attorney with a settlement statement disclosing the total settlement, listing the payments made from the settlement proceeds (including distributions to medical creditors, payment of litigation expenses, and distributions to the clients) and the balance remaining in trust. For the first time, the statement disclosed that the total amount of funds distributed from the settlement for attorney fees was $1.6 million, but still did not disclose that $533,333.33 of that

was paid to the Alabama attorney. The respondent did not furnish a copy of his fee agreement.

The Alabama attorney's participation in the case was minimal. The clients never hired him to be their attorney, and their contract with the respondent did not mention a role for any other attorney not associated with the respondent's law firm. As the case progressed, and unbeknownst to the clients, the respondent and the Alabama attorney discussed the case by telephone from time to time, but the Alabama attorney's role was not significant. He discussed some ideas about insurance coverage with the respondent, but he was not involved with research, drafting of pleadings or other papers, investigation, discovery, court appearances, negotiations, or client communications. The clients first became aware of the payment to the Alabama attorney in March 2001 when the clients were notified by the IRS that the boy owed taxes on the interest earned by a certificate of deposit held by the uncle for the benefit of the boy. As it turned out, the Alabama attorney had in turn paid the uncle $177,600 of the $533,333.33 he received from the respondent. That amount was placed in trust for the boy by the uncle without the clients' or the boy's knowledge.

By June or July 1999, the respondent was ready to close the case and distribute the $112,972 in settlement funds remaining in his trust account. The respondent paid that amount to the clients on November 22, 1999. On December 6, 1999, the client's attorney once again asked the respondent for a copy of the written contingent fee agreement and also asked for an explanation of how the respondent's attorney fees were calculated. The respondent never replied.

## II. The Charged Violations

The hearing officer found that the respondent charged an unreasonable fee in violation of Ind.Professional Conduct Rule 1.5(a)[3] "because the contingent fee agreement did not clearly state the method by which the fee was determined." Findings of Fact at 34. He also concluded that the respondent violated Prof.Cond.R. 1.5(c)[4] by failing timely to provide a written settlement disbursement summary to his clients, Prof.Cond.R. 1.3 and 1.15(b)[5] by delaying payment of the medical creditors and lien holders, and Prof.Cond.R. 1.5(e)[6] by dividing his attorney fees with the Alabama attorney without the client's knowledge.

## A. Unreasonable fee

■ The Disciplinary Commission alleged that the respondent charged an unreasonable fee by "recovering a contingency fee on settlement funds that were not to be received until the future without discounting the future settlement payments to present value." Verified Complaint at 4. Respondent contends that there is no requirement that a structured settlement be discounted to present value when calculating a contingent attorney fee on the settlement.

3. Professional Conduct Rule 1.5(a) provides:

A lawyer's fee shall be reasonable. The factors to be considered in determining the reasonableness of a fee include the following: (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly; (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or by the circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and (8) whether the fee is fixed or contingent.

4. Professional Conduct Rule 1.5(c) provides:

A fee may be contingent on the outcome of the matter for which the service is rendered, except in a matter in which a contingent fee is prohibited by paragraph (d) or other law. A contingent fee agreement shall bed in writing and shall state the method by which the fee is to be determined, including the percentage or percentages that shall accrue to the lawyer in the event of settlement, trial or appeal, litigation and other expenses to be deducted from the recovery, and whether such expenses are to be deducted before or after the contingent fee is calculated. Upon conclusion of a contingent fee matter, the lawyer shall provide the client with a written statement stating the outcome of the matter and, if there is a recovery, showing the remittance to the client and the method of its determination.

5. Professional Conduct Rule 1.3 provides:

A lawyer shall act with reasonable diligence and promptness in representing a client.
Professional Conduct Rule 1.15(b) provides:
Upon receiving funds or other property in which the client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property.

6. Professional Conduct Rule 1.5(e) provides:

A division of fee between lawyers who are not in the same firm may be made only if: (1) the division is in proportion to the services performed by each lawyer or, by written agreement with the client, each lawyer assumes joint responsibility for the representation; (2) the client is advised of and does not object to the participation of all the lawyers involved; and (3) the total fee is reasonable.

██ We agree with the hearing officer's conclusion that the respondent's fee agreement with the client failed to state clearly the method by which the fee was determined. That in and of itself does not constitute a violation of the prohibition in Prof.Cond.R. 1.5(a) against unreasonable fees.[7] However, we find that the respondent's fee was unreasonable nonetheless, because the fee agreement, in calling for 40% of settlement, must be based on the value to the client, unless some other method is clearly spelled out. If an attorney wishes to calculate such a fee based on anything else, the fee agreement must make those calculations clear to the client. Here, by calling for 40% of the settlement, the agreement limited respondent's fee to 40% of the value and no more.

██ Use of the term "gross proceeds" does not salvage this agreement. A lay person might well understand that to mean only that expenses will not be deducted, and may have no understanding of what a structured settlement is or that it is a possibility. Where a contingency fee on a structured settlement will not be collected as settlement funds are actually received, a lawyer cannot ignore the time value of money or let any material risk of nonrecovery fall disproportionately on the client. In *Matter of Myers,* 663 N.E.2d 771 (Ind. 1996), a client hired attorney Myers to recover investment funds. Myers and the client later entered into a written contingency fee agreement, which provided that Myers would retain as his fee "10% of the gross recovery of money and/or property prior to the filing of a claim." Myers thereafter negotiated a settlement on behalf of the client, which terms provided for payments totaling $550,000: $50,000 due upon execution of the settlement agreement, $50,000 due shortly thereafter, and $15,000 per month for 30 months. Myers deducted $35,000 for his fee from the first payment and deducted $15,000 from the second payment. He then relinquished any claim to the remaining $5,000 in fees and notified the defendant that the remaining periodic payments of $15,000 should be made directly to the clients. The defendant defaulted after paying a total of only $160,000 of the $550,000 promised. We concluded that the lawyer's retention of the bulk (91%) of his anticipated $55,000 fee from the initial two payments of the structured settlement was unreasonable because, although the fee agreement called for a fee of ten percent, his fee in fact approached thirty percent of the total actual recovery. *Myers* at 774.

*Myers* turned principally on the collection risk in deferred payments, but the time value of money is subject to the same principle. Other jurisdictions, in valuing structured settlements have expressly held that contingency fees on structured settlements must account for the time value of money and therefore be based upon either the settlement's cost (i.e. the price of annuity or its present value).[8] Deferred pay-

---

7. If the agreement permitted the fee the respondent sought, it appears to violate Prof. Cond.R. 1.5(c), which requires contingency fee agreements to be in writing and to state the method by which the fee is to be determined. However, the Commission charged a Prof.Cond.R. 1.5(c) violation only with respect to the respondent's failure to provide the clients with an adequate settlement statement.

8. As pointed out by the parties in this case, many jurisdictions, including courts in Florida, California, New Jersey, South Carolina, Washington, Michigan, and New York, use "cost approach" method in valuing annuity payments made pursuant to structured settlements. *See e.g.,* Fla.Prof.Cond.R. 4–2.5(f); *Schneider v. Kaiser Foundation Hospitals,* 215 Cal.App.3d 1311, 264 Cal.Rptr. 227, 231 (1989); *Merendino v. FMC Corp.,* 181 N.J.Super. 503, 438 A.2d 365, 368 (1981); *Johnson*

ments always include a time value factor, and can also include risk of collection factors. Shifting either without full disclosure and consent of the client is simply a breach of the fee agreement. A lay person may not readily grasp the economic significance of deferred payments. But we think it should be obvious to any attorney who competently represents a party in negotiating a transaction involving deferred payments.

Here the amount the respondent retained for himself was substantially in excess of 40% of the value of the settlement at the time he took his fee. This is true whether value is calculated on the cost of the annuity, which is one reasonable approach, or by discounted cash flow. As

such it is unreasonable when the fee agreement simply called for a 40% fee.

The respondent contends that at the time he took the $1.6 million fee, the figure functioned as a "cap" because he otherwise would have been permitted to calculate his fee by taking 40% of the $2 million cash plus 40% of the gross amount of the clients' guaranteed future payments ($4,341,431.29), without discounting to present value. The respondent's fee, using this method, would have been $2,536,572.40. The annuity was purchased for $1,465,698. Forty percent of the lump sum plus the purchase price of the annuity (its "cost") is $1,386,792. According to the respondent's expert, the present value [9] of the cash stream payable under the annuity was slightly less ($1,368,509) than the cost of the annuity.[10] Thus, whether valued

---

v. Sears, Roebuck & Co., 291 Pa.Super. 625, 436 A.2d 675 (1981); Matter of Williams, Jr., 336 S.C. 578, 521 S.E.2d 497 (1999); Wash. Prof.Cond.R. 1.5(c)(2); Re Estate of Muccini, 118 Misc.2d 38, 460 N.Y.S.2d 680 (1983). Other states, including Michigan, Alabama, have used the "present value" approach. See, e.g., Mich.Prof.Cond.R. 8.121 (2002); Ex parte St. Regis Corp., 535 So.2d 160 (Ala.1988). The Association of Trial Lawyers of America's position on the topic is set forth in a Board of Governor's resolution stating, "contingent fees on structured settlements should always be calculated on the cost or present value of the annuity, whichever is lower, unless the fee is paid in periodic payments." Commission's Exhibit A, ATLA Board of Governors Resolution on Contingent Fees, July 18, 1986. Under either approach, it is recognized that the true immediate value of the structured settlement is that which takes into account the time-value of money.

9. "Present value" may be defined as the total sum of future payments based upon the plaintiff's projected life expectancy discounted to reduce the sum to its value in today's dollars. See Nguyen v. Los Angeles County Harbor/UCLA Medical Center, 40 Cal.App.4th 1433, 1448–50, 48 Cal.Rptr.2d 301, 309–310 (1995). The precise discount rate used by the expert is not clear from the record.

10. This calculated present value of the annuity is without regard to income tax considerations. Under the annuity the client obtained in the settlement, payments may receive more favorable tax treatment than if the client received a lump sum and purchased an annuity. See Stipulated Ex. 217 at 36–38, Ex. A. The respondent's expert testified that the client's hypothetical tax advantages should be considered when arriving at a present value. However, as noted by the Commission, the client's lump-sum settlement, as compensatory damages, would not have been taxable. Interest earned after the settlement was invested would have been taxable income. A qualified structured settlement, like the one in this case, may result in all future payments from the annuity being treated as non-taxable income. The respondent's expert testified that the present value of the client's future stream of income should be determined by asking what amount of money the client would need to start out with in order to invest in such a way that, after taxes on the earned interest, would pay the same stream of income as the annuity. It is upon this rubric that the respondent's expert calculated what was, in his opinion, the true "present value" of the settlement. We agree with the Commission that the client's tax savings inherent to the structure of the settlement and income tax law are not part of the "gross amount recovered" for purposes of calculating contingent attorneys

using the cost of the annuity or the discounted cash flow from the annuity, the fee the respondent actually retained was over $200,000 in excess of 40% of the total present value of the settlement. An attorney's retention of a fee greater than that specified in the fee agreement with the client, without the renegotiated agreement of the client is strongly indicative of an unreasonable fee. *Matter of Lehman*, 690 N.E.2d 696, 702 (Ind.1997).

■ The respondent collected his entire fee, $1.6 million, from the initial payment of $2 million. At the moment he collected his fee, it amounted to 80% of the "gross amount recovered," at that time. We have held that taking an entire contingent fee from the first payments of a structured settlement, absent explicit authorization in the fee agreement, amounts to an unreasonable fee. *Myers, infra* (holding that "gross amounts recovered" in contingent fee agreement meant "actual receipt" of funds); *Matter of Benjamin*, 718 N.E.2d 1111 (Ind.1999) (lawyer took entire contingent fee from first settlement payments). Absent a contrary written agreement, contingent fee recoveries should be taken only as the funds are actually received. Restatement (Third) of the Law Governing Lawyers, Section 35(2) ("Unless the contract construed in the circumstances indicates otherwise, when a lawyer has contracted for a contingent fee, the lawyer is entitled to receive the specified fee only when and to the extent the client receives payment."). The hearing officer found that the clients expressed a desire to have the respondent's fee deducted from the lump sum payment so that the annuity payments would be preserved for the benefit of the boy. This does not justify increasing the amount of the fee, which is the effect of accelerating its pay-

ment ahead of the client's recovery without discounting for the time-value of money. If an attorney wishes to calculate a fee based on this consideration, it needs to be spelled out for the client in the written agreement, and the economic cost and risk of noncollection to the client needs to be made clear. Here there appears to be no risk of collection as there was in *Myers*, but that factor is also a necessary disclosure if the attorney wishes to shift it to the client.

We recognize the value in the availability and use of structured settlements. They often provide a severely injured plaintiff with a regular, permanent income stream for future medical expenses and support and may result in tax savings. If the parties agree to it, there is nothing inherently wrong with a lawyer's receiving the full amount of his fee in current dollars and the client's receiving payment in future dollars so long as the relationship between the present value of the two is in proportion to the percentage of the lawyer's fee agreed to in the fee agreement. But that condition was not met here.

We conclude that the respondent's fee was unreasonable in violation of Prof. Cond.R. 1.5(a), because it ignored the time-value of money and thereby exceeded the fee agreed to in the initial written fee agreement with the clients by over $200,000. The respondent's proposed method of calculating the present value of the structured settlement, by factoring in the hypothetical tax savings inuring to the client, is not spelled out in the fee agreement and is contrary to a lay person's understanding of the written agreement the respondent created. It appears to be a justification after the fact, not a condition in setting the fee, and one not explained to

---

fees. If an attorney wishes to have that considered that a part of the fee, the written

agreement must spell it out. Of course, the fee must also be reasonable.

the client. The requirement of a written fee agreement includes spelling out any unusual calculations and is designed to avoid exactly the kind of dispute that arose here.

## B. Fee sharing

Indiana Professional Conduct Rule 1.5(e) provides:

A division of fee between lawyers who are not in the same firm may be made only if:

(1) the division is in proportion to the services performed by each lawyer or, by written agreement with the client, each lawyer assumes joint responsibility for the representation;

(2) the client is advised of and does not object to the participation of all the lawyers involved; and

(3) the total fee is reasonable.

■■■■■ All three requirements are lacking in this case. The Alabama attorney's involvement in the case was minimal. It consisted of only a few telephone conversations with the respondent about insurance coverage issues relative to the case. Clearly, the division of fees between the respondent and the Alabama attorney was not in proportion to the services provided by the two. Nor were the clients aware of the Alabama attorney's participation. Absent proportionality, the fee division would nevertheless have been permissible if: (1) the client was advised of, and had no objection to, the fee sharing, (2) the respondent and the Alabama attorney, by written agreement with the client, each assumed joint responsibility for the representation, and (3) the total fee was reasonable. There is no evidence of a joint responsibility agreement in this case (the respondent's letter to the Alabama attorney states that the respondent's office takes "primary responsibility" for the case). We conclude that the fee sharing

between the respondent and the Alabama attorney in this case violated Prof.Cond.R. 1.5(e).

## C. Delays in wrapping up the transaction

■■■ The respondent received the lump-sum settlement proceeds in mid-January 1998. At that time, several third parties had interests in the settlement proceeds. Some of the creditors—the subrogated insurers—were statutorily obligated to reduce their claims to share *pro rata* in the costs of the recovery. The application of this statutory obligation is not complex and there is no evidence in the record establishing any resistance by the subrogated insurers to do so upon being informed of the requirements of the statute. Furthermore, the respondent had collected information about the boy's special medical damages during the lawsuit. Upon settlement of the suit, therefore, the respondent was well aware of the identity of the subrogation and medical provider claimants. The respondent did have to scrutinize the third-party medical bills to check for duplications, billing errors, and unauthorized charges. His efforts in regard to these concerns resulted in the respondent negotiating discounts and reductions of approximately $115,793.01 from the original claims. However, the respondent had paid only one of the medical bills by the end of 1998, some 10 months after he received the settlement proceeds, and he was aware of at least most of the claimants' interests before the lawsuit settled. He did not pay the first medical creditor until eight months after receiving the settlement proceeds, and then only after that creditor threatened the respondent with a lawsuit. The respondent began paying the rest of the third-party claims only after the clients hired a new attorney. That the respondent, following the client's new attorney's

second contact, soon thereafter paid some $282,189.87 in claims strongly indicates that there was nothing slowing the claims payment process save the respondent's inattention. Professional Conduct Rule 1.3 requires lawyers to act with reasonable diligence and promptness in representing clients. Professional Conduct Rule 1.15(b) provides, in relevant part, that a lawyer shall promptly deliver to third persons any funds the third person is entitled to receive. The respondent's delay in paying third party creditors following his receipt of the settlement proceeds violated these rules and ultimately required the clients to go to the expense of hiring another attorney to prod the respondent to finish a project for which respondent had already collected over $1 million in fees.

### D. Written settlement statement

Professional Conduct Rule 1.5(c) requires that, upon conclusion of a contingent fee matter, the lawyer is to provide the client with a written statement stating the outcome of the matter, and, if there is a recovery, showing the remittance to the client and the method of its determination. At the time of settlement in late November 1997, the respondent did not provide to the clients a written statement showing the total settlement, the anticipated deductions, a specification of costs of litigation that were advanced by the respondent, and the net recovery to the clients. The respondent did not provide a written settlement statement to the clients in advance of removing the attorney fees or expenses from trust. On December 11, 1998, the respondent reported to the clients the distributions he had made from the settlement proceeds, 11 months after receiving the settlement proceeds. At that time, he did not disclose the $24,000 he had withdrawn to cover his expenses, the $1,066,666.66 he withdrew as his own attorney fees, or the

$533,333.33 he withdrew to provide to the Alabama attorney. On June 10, 1999, after several unanswered requests from the clients' new attorney for a full accounting, the respondent provided to them a settlement statement disclosing the total settlement, the distributions made to medical creditors and others, and the balance remaining in trust. That statement again omitted mention of the fee paid to the Alabama attorney. In December 1999, while the final distributions were being made from the settlement proceeds, the clients' attorney asked the respondent for an explanation of how his fee was calculated. The respondent never replied.

We find that the respondent violated Prof.Cond.R. 1.5(c) by failing to provide an adequate settlement statement upon conclusion of the representation. Because the respondent failed to state the method of calculating his fee, his statements did not adequately specify the method of determining the remittance to the client. Additionally, the respondent's settlement statements failed to disclose the portion of the fee paid to the Alabama attorney.

### III. Sanction

Determination of an appropriate sanction for the respondent's misconduct requires consideration of several factors, including the respondent's state of mind, the duty violated, actual or potential injury to the client, the duty of this Court to preserve the integrity of the profession, the risk to the public in allowing the respondent to continue in practice, and mitigating and aggravating circumstances. *Matter of Cox*, 662 N.E.2d 635 (Ind.1996).

The hearing officer found that the respondent's delay in resolving claims of third parties resulted in direct and significant harm to the clients. For example, the

respondent's delay in paying one medical provider resulted in that provider's freezing its account with the clients, and requiring the clients on one occasion to pay cash for necessary medical supplies.

In mitigation, the hearing officer found that the clients agreed that the respondent did an exemplary job prosecuting the case and obtained an excellent result. We are strongly influenced by the testimony of the clients wherein they expressed their deep gratitude to the respondent for the settlement he obtained for them and his expertise in recovering on their behalf. Their dissatisfaction arose only in relation to the amount of attorney fees and his handling of pending medical claims. The hearing officer also found that the respondent has no prior disciplinary actions and has had an exemplary career, performing substantial service to the bar and the justice system. Further, we note that the respondent placed $215,000.00 [11] in an interest bearing escrow account shortly after the disciplinary proceeding was commenced. We direct the respondent to refund to the clients $252,596.40,[12] plus interest computed at 8% annually from the date of the judgment in this case, without prejudice to any rights of the clients, and to reimburse the clients for the attorney fees they incurred to prod him to complete the project.

Absent substantial aggravating or concurrent misconduct, this Court has generally imposed either public or private reprimands or at most short suspensions on attorneys who exact unreasonable fees. *See, e.g., Matter of Myers, infra* (public reprimand); *Matter of Benjamin,* 718 N.E.2d 1111 (Ind.1999) (public reprimand for lawyer who kept fee in excess of that permitted by statutes governing recoveries from Indiana Patient Compensation Fund, and was taken from first installment of periodically-paid settlement, contrary to client wishes); *Matter of Lehman,* 690 N.E.2d 696 (Ind.1997) (violation of rules governing contingent fee agreements, and misrepresentation, by attorney who failed to disclose to personal injury client that attorney would retain *pro rata* share of costs of recovery, which insurers holding subrogation claims against client were required by statute to pay, warranted reprimand). We view this case primarily as an unreasonable fee case, although by that characterization we do not wish to diminish the gravity of the respondent's other transgressions.

The Clerk of this Court is directed to provide notice of this order in accordance with Admis.Disc.R. 23(3)(d), to the hearing officer, and to the clerk of the United States Court of Appeals for the Seventh Circuit, the clerk of each of the United States District Courts in this state, and the clerks of the United States Bankruptcy Courts in this state.

Costs of this proceeding are assessed against the respondent.

11. Using the discount rate supplied by the respondent's expert witness, the present value of the annuity and contingent benefits was $1,368,509. Accordingly, the total settlement value for purposes of calculating the respondent's contingent fee is $3,368,509 with the respondent's agreed fee being $1,347,403.60, or $252,596.40 less than he retained. Using the cost approach, the total settlement value was $3,465,698, with the respondent's fee being $1,386,279.20, or $213,720.80 less than he retained. Because the purchase of an annuity should preclude risk of collection issues that might apply to long term structured settlements, this alternative is more costly to the client. We consider it nevertheless a reasonable approach.

12. This figure is calculated using the present value the respondent's expert attached to the annuity in the computation of the total value of the settlement, as described in footnote 11, *supra.* Pursuant to ATLA's resolution, the contingent attorney fee is to be calculated on the cost or present value of the annuity, whichever is lower. *See* footnote 8, *supra.*

DICKSON, BOEHM, and RUCKER, JJ., concur.

SULLIVAN, J., concurs and dissents with separate opinion.

SHEPARD, C.J., not participating.

SULLIVAN, Justice, concurring and dissenting.

I concur in the Court's opinion except as to sanction. I agree that respondent's career and contributions to the profession are weighty mitigating circumstances. I nevertheless believe a period of suspension is warranted. While I would find a public reprimand sufficient sanction for any of the violations standing alone, I believe it is insufficient for the combination of violations committed here. I do concur with the Court's directing the respondent to refund the excess of the fee with interest and to reimburse the clients for the attorneys fees they incurred to prod him to complete the project.