Robert **MORRELL** and Donna Morrell, **Individually and As Next Friends of Madeline Morrell, A Minor, Appellants,**

v.

Mary Angeline **FINKE, M.D.,** Obstetrical & Gynecological Associates of Arlington, Arlington Memorial Hospital Foundation, Inc. d/b/a Arlington Memorial Hospital, Rose Fenton, R.N.C., Sandy Stephens, R.N., and Marianne Walker, R.N., Appellees,

and

Mary Angeline Finke, M.D. and Obstetrical & Gynecological Associates of Arlington, Appellants,

v.

Robert Morrell and Donna Morrell, Individually and As Next Friends of Madeline Morrell, A Minor, Appellees,

and

Arlington Memorial Hospital Foundation Inc. d/b/a Arlington Memorial Hospital, Rose Fenton, R.N.C., Sandy Stephens, R.N., and Marianne Walker, R.N., Appellants,

v.

Robert Morrell and Donna Morrell, Individually and As Next Friends of Madeline Morrell, A Minor, Appellees.

No. 2–01–159–CV.

Court of Appeals of Texas, Fort Worth.

Nov. 3, 2005.

Rehearing Overruled Dec. 15, 2005.

Hill Gilstrap, P.C., Frank Gilstrap, and Stefanie Martin Klein, and Robert A. Gam-

mage, Arlington, for Robert and Donna Morrell.

Cantey & Hanger, L.L.P., and John F. Gray, Evelyn R. Leopold, Fort Worth, Strasburger & Price, L.L.P., and P. Michael Jung, Dallas,for Arlington Memorial Hospital Foundation, Rose Fenton, R.N.C., Sandy Stephens, R.N., and Marianne Walker, R.N.

Cowles & Thompson, P.C., and Charles T. Frazier, Jr., and Mark D. Cronenwett, and Gregory J. Lensing, Dallas, for Mary Angeline Finke, M.D., and Obstetrical & Gynecological Associates of Arlington.

## OPINION

SUE WALKER, Justice.

### I. INTRODUCTION

Donna Morrell gave birth to her first child, Madeline, on December 31, 1994, at Arlington Memorial Hospital. Donna and her husband, Robert Morrell, individually and as next friends for Madeline (Plaintiffs), brought suit alleging that Madeline suffered permanent neurological injuries proximately caused during labor and delivery by the negligence of Defendants Mary Angeline Finke, M.D.; Dr. Finke's employer, Obstetrical & Gynecological Associates of Arlington, Inc. (the clinic); Rose Fenton, R.N.C., Sandy Stephens, R.N., and Marianne Walker, R.N. (the nurses); and their employer, Arlington Memorial Hospital Foundation, Inc. (the hospital), collectively Defendants. After a five-week trial, the jury returned a verdict for Plaintiffs and against all Defendants.[1] The trial court granted a judgment notwithstanding the verdict (JNOV) on the jury's $500,000 damage award to Donna and Robert for

1. Because all parties to the trial court judgment have perfected appeals to this court all parties are both appellants and appellees. See TEX.R.APP. P. 26.1(d). Accordingly, for

clarity we sometimes refer to the parties by their trial court status as Plaintiffs and Defendants or by their name or entity, i.e., clinic, nurses, or hospital.

mental anguish and on the jury's $2,000,000 damage award to Donna and Robert for loss of consortium. Plaintiffs appeal from the JNOV. Dr. Finke, the clinic, the nurses, and the hospital appeal from the judgment against them, challenging both liability and damages. For the reasons discussed below, we will modify the trial court's judgment to delete the imposition of joint and several liability upon the nurses for the jury's award of past medical expenses to Robert and Donna Morrell individually and render judgment that Robert and Donna, individually, recover nothing from the nurses on their claim for past medical expenses because that claim is barred by the statute of limitations. We will also modify the trial court's judgment to delete the imposition of joint and several liability upon Rose Fenton, R.N.C. because the jury found her only five percent proportionally responsible. As modified, we will affirm the remainder of the trial court's judgment, including the JNOV on the Morrells' mental anguish and loss of consortium claims.

## II. Factual and Procedural Background

### A. Admission to Hospital

Donna's water broke in the early hours of December 31, 1994. Her husband, Robert, drove her to the hospital, where she was admitted to the labor and delivery unit at 8:45 a.m. Both sets of the baby's grandparents arrived soon thereafter. Upon Donna's arrival, the nurse on duty drew blood for laboratory analysis, attached an external fetal monitor to record the baby's heartbeat, started an intravenous line, performed a cervical examination, and prepared Donna for labor.[2]

### B. Fetal Heart Monitor Strip

Experts testified that a baby's heart rate is monitored during labor as a means of assessing the baby's oxygenation, including oxygenation of the baby's brain. A fetal heart monitor strip is read at regular and frequent intervals to determine whether the baby's heart rate reflects "hypoxia," a deficiency of oxygen reaching the tissues of the body that could lead to depletion of the baby's oxygen reserves over time, resulting in brain damage.

A fetal heart monitor strip will be either "reassuring" or "nonreassuring." In fact, the hospital's "Fetal Heart Monitoring Policy (Nurses Responsibility)" provides that fetal heart "[p]atterns *will be* classified as either reassuring or nonreassuring." [Emphasis added.] AONE[3] standards as well as the hospital's fetal heart monitoring policy define "accelerations" as increases in the baby's heart beat of fifteen beats per minute lasting fifteen seconds. Following a contraction, accelerations are "reassuring" by showing that the baby is oxygenated and tolerating labor. "Beat-to-beat variability" is defined as follows by the hospital's fetal heart monitoring policy:

> Short Term Variability (beat to beat)— Is most accurately determined by internal spiral electrode. This aspect of patient monitoring is the most indicative of fetal well-being and response to stressors of labor. Please document as:
>
> Present = 3 bpm or greater
>
> Absent = < 3 bpm

Thus, a normal variation of three beats per minute or more in the fetal heart rate is a reassuring sign of fetal well-being, indicating that the baby's brain is responding to oxygenation. A less than three-beat-per-minute variation in the baby's heart rate

---

2. Defendants all testified that they possessed no independent recollection of Donna's labor or of Madeline's birth; they testified as to what their usual practice would have been.

3. The American Organization of Nurse Executives.

documents that beat-to-beat variability is "absent" and constitutes a nonreassuring pattern.

The fetal heart monitor strip will also show "decelerations," (decels) in the baby's heart rate that may be early, variable, or late. Early decels occur with a contraction and indicate a benign pattern. Variable decels, variable in shape rather than uniform in pattern, may also occur during the contraction. Variable decels are generally caused by umbilical cord compression and are indicative of decreased oxygenation to the baby. Late decels document a deceleration of the baby's heart rate beginning at or after the midpoint of a contraction. Late decels are indicative of placental insufficiency, meaning that the baby is not being perfused well by the placenta.

Babies have stored oxygen in cells throughout their bodies called "fetal reserves." Severe, prolonged, variable, or late decelerations are "nonreassuring" and are considered "ominous" if they become "repetitive" because every late or variable decel presents the possibility of depleting fetal reserves, depending on the degree of the insult.[4] Experts testified that, over time, chronic or repetitive decels are nonreassuring because they deplete fetal reserves and make the baby less able to tolerate each successive insult. Madeline's fetal heart monitor strip began at approximately 8:45 a.m., tracing her heart rate from the external fetal heart monitor. At approximately 9:40 a.m., Dr. Finke applied a fetal scalp electrode to Madeline's head to monitor her heart rate more accurately. Experts testified that Madeline's fetal heart monitor strip tracings were nonreassuring from the start because she had no heart rate "accelerations" as that term was defined by the hospital fetal heart monitor-

ing policy and, also according to the policy, beat-to-beat variability was "absent."

## C. Morning

Because Madeline's fetal heart monitor strip was nonreassuring, nurses began an IV on Donna and turned her onto her left side. Madeline's strip still did not become reassuring. Dr. Finke, the obstetrician on call for the clinic at the hospital that New Year's Eve, first saw Donna at 9:40 a.m. Dr. Finke reviewed the prenatal records, took Donna's medical history, examined the fetal heart monitor strip, performed a cervical examination, and determined the baby's orientation by sonogram. The baby was full-term at an estimated eight pounds and active, the amniotic fluid was clear with no bleeding, and Donna was having irregular contractions.

Dr. Finke confirmed from her examination that Donna's pelvis was adequate for vaginal delivery, and she anticipated a vaginal delivery with the alternative of a cesarean section if maternal or fetal indications were present. At 10:00 a.m., Dr. Finke formulated her plan to administer Pitocin to stimulate uterine contractions if no further cervical dilation occurred within two hours. She wrote orders for lab work, Pitocin, an antacid, and pain and antinausea medication if needed.

Donna's cervix was dilated only one of the ten centimeters necessary for delivery, with the baby in a head-downward position at a minus two station in the birth canal at 8:45 a.m. Dr. Finke's examination revealed that the fetus had progressed to a minus one station at 10:00 a.m. "Station" refers to the position of the baby's head as it descends in the birth canal, with reference to the ischial spines. Dr. Finke used a five-point system for measuring the station

---

4. *See Cruz v. Paso del Norte Health Found.*, 44 S.W.3d 622, 625 (Tex.App.-El Paso 2001, pet. denied) (providing similar description from expert testimony in case involving obstetrical medical malpractice claim).

by centimeters, ranging from "minus five" centimeters above, to "plus five" below the ischial spines. The nurses' method for measuring stations was purportedly different from Dr. Finke's, and this difference would generate a factual dispute at trial.

At 11:00 a.m., Nurse Marianne Walker came on duty as the labor and delivery nurse assigned to Donna. By 11:15 a.m., the variable decelerations in Madeline's heartbeat started to widen out and deepen, meaning that it was taking her heart longer to return to baseline. At 12:05 p.m., Nurse Walker began administering Pitocin, as Donna was still not in active labor and dilation of her cervix was not progressing. By 12:40 p.m., Donna was dilated to two centimeters, and the baby was making some progress.

### D. Afternoon

Dr. Finke next saw Donna at 2:00 p.m., performed a vaginal exam, and placed an intrauterine pressure cannula to better assist in evaluating the frequency and intensity of Donna's contractions. Donna had four to five contractions lasting fifty seconds in a ten-minute span. Dr. Finke ordered the Pitocin continued, and Nurse Walker increased the Pitocin dosage to nine milligrams. According to the hospital's records, Dr. Finke did not enter Donna's room again during the next five hours, until 7:00 p.m.

At approximately 3:10 p.m. and 3:13 p.m., the fetal heart monitor strip documents several late decels, one of them showing a sudden drop in Madeline's heart rate from 130 beats per minute down to 60 beats per minute. According to Nurse Corrine LaMont, Plaintiff's nursing expert, this portion of the strip indicates "a fetus that's having a hard time coping to get back up to the baseline.... It indicates that the baby is having a hard time and is losing its reserves and is being stressed more than it can tolerate." Additionally, Donna's uterus had become hyperstimulated by the Pitocin increase, and she experienced nine contractions in ten minutes. The nurses and doctors agreed that a hyperstimulated uterus decreases oxygen to the baby.

At 3:25 p.m., Nurse Walker turned off the Pitocin and gave Donna oxygen. She notified Dr. Finke of Donna's status at 3:30 p.m. From 3:30 p.m. to 4:30 p.m., the strip documents continued variable and late decels, with no accelerations or beat-to-beat variability. Nurse Walker restarted the Pitocin at a lower level at 4:10 p.m. At 4:20 p.m., an anesthesiologist began an epidural anesthesia. At 4:40 p.m., the strip shows a late decel lasting for over a minute. Nurse LaMont explained that the increasing length of time it was taking for Madeline's heart to return to baseline indicated that she was losing her ability to recover, that she was being stressed, and that she had suffered so many insults that "it [was] taking [her] longer and longer to fight back." Donna's uterus again became hyperstimulated by the Pitocin; she experienced seven contractions in ten minutes, ensuring a problem with Madeline's oxygenation. Following a deceleration, lasting over ninety seconds, Nurse Walker turned the Pitocin off again.

Dr. Finke's 4:50 p.m. progress note indicated that the baby was still at zero station and that moderate variable decels were occurring, some after contractions.[5] But Donna's cervix was now dilated seven to

---

5. A fact issue arose at trial as to whether Dr. Finke actually examined Donna prior to making this 4:50 p.m. progress note; Dr. Finke testified that her customary practice would have been to examine Donna prior to making the note, but she conceded that she could have made the note based on information the nurses provided to her without actually examining Donna.

eight centimeters, so Dr. Finke's plan at that time was to continue to monitor Donna and to discontinue the Pitocin because of Donna's increased contractions. Dr. Finke testified that in her opinion, there was still no contraindication to proceeding with a vaginal delivery.

### E. Evening

At 4:59 p.m., the fetal heart monitor strip documented another severe "biphasic" deceleration followed immediately by another deceleration before a return to baseline was achieved. Dr. Finke agreed that this tracing was "significant" because, if it became repetitive, it would be a sign that the baby was not tolerating labor. Another severe decel followed, and it took Madeline's heart approximately four minutes to reestablish some sort of baseline. Another decel immediately followed; Madeline's heart took over a minute to return to baseline. The strip showed decelerations that were becoming deeper, longer, and more frequent.

Experts testified that by 5:15 p.m., the fetal heart monitor strip documented "marked variability" in the decelerations, some lasting eighty seconds. "Marked variability" is significant because it means the baby is having a hard time compensating and is using more reserves. By 5:20 p.m., the strip showed a pattern of repetitive late decelerations, a nonreassuring, "ominous sign," requiring intervention.

Nurse Walker conducted vaginal exams at 5:10 p.m. and again just before 6:00 p.m., revealing that Donna's cervix was dilated to nine centimeters. During this time, the strip shows that Madeline continued to experience decels; one lasting almost three minutes. Nurse LaMont explained that at this point, every prolonged deceleration constituted an insult to the baby, causing the baby to lose its reserves. The fetal heart monitor strip was becoming more and more alarming; the deceler-

ations were getting deeper, longer, and slower to return to baseline, documenting that the baby was developing more and more of an oxygen deficit.

At 6:30 p.m., the nurses had Donna try "pushing" a few times to help complete the cervix's dilation and move her to the second stage of labor, but the efforts were unsuccessful. As Donna attempted to push, Madeline experienced another prolonged deceleration followed by an increase in her heart rate to thirty beats per minute over baseline. The spike in Madeline's heart rate constituted another nonreassuring sign, according to Nurse LaMont, because "as your oxygen supply gets deleted, your heart beats faster because it's trying to make up in quality with quantity of getting oxygenated blood through."

By 6:45 p.m., Donna's contractions were becoming stronger and closer together. The strip continued to document nonreassuring, deeper, longer, and more frequent decels. At trial, Dr. Finke explained the increase in variability and number of decels on the fetal heart monitor strip between 6:00 p.m. and 7:00 p.m. was normal because Donna had moved into the pushing phase of labor.

Shortly before 7:00 p.m., Nurse Walker gave Dr. Finke a report on the mother's and the baby's status, and at 7:00 p.m., Dr. Finke examined Donna. Dr. Finke determined that the baby had moved past the posterior rim of the cervix, although not the anterior rim. Dr. Finke determined that the baby was making some progress but was in an occiput transverse (OT) position, at an angle that would make negotiation of the birth canal difficult. Dr. Finke attempted to rotate Madeline to the preferred occiput anterior (OA) face-down position but was unable to do so and rotated her, instead, to the less preferred occiput

posterior (OP) face-up position. Dr. Finke noted that the baby continued to have variable decels but said these were caused by her efforts to turn the baby and did not concern her.

From 7:00 p.m. on, for the last hour of Donna's labor, the nurses stopped charting Donna's and Madeline's care. The last chart entry concerning the station Madeline had progressed to documents Madeline at the zero station. The fetal heart monitor strip shows another severe decel occurred at 7:10 p.m., but Dr. Finke explained it was not a decel that was of concern to her because it occurred when the linen on Donna's bed was changed. At 7:20 p.m., Donna became fully dilated and completely effaced, and the nurse began having her push.

After Dr. Finke examined Donna and rotated the baby at approximately 7:00 p.m., she was called across the hall to deliver another baby. That baby, delivered by forceps, was born healthy at 7:10 p.m. The medical professionals, both doctors and nurses, agreed that the "7:10 p.m. baby's plan of delivery" should not dictate or have any effect on Madeline's plan of delivery. Nurse Rose Fenton [6] explained that if two babies needed Dr. Finke's attention at the same time, the nursing standard of care does not permit the nurses to simply wait for Dr. Finke to become available. The standard of care requires the nurses to proceed with finding another doctor: the nurses would have called the house supervisor and said, " 'We have a situation, I need two doctors, there's only one here,' [and] the emergency room doctor could have come up."

At 7:15 p.m., while Dr. Finke was still out of Donna's room, the fetal heart monitor strip recorded another severe prolonged variable decel down to 60 beats per minute for forty seconds, followed by tachycardia, with a spike in the heart rate to 180. Dr. Finke testified that this decel would have caught her attention, but explained that Donna was pushing by this time and said that she did not give the same credence to decelerations occurring in the pushing phase of labor as she did to those occurring during the active phase of labor. Each time Donna pushed, a severe prolonged decel occurred: Madeline's heart rate dropped to 50 beats per minute for over a minute with each decel. At 7:25 p.m., Madeline was still at zero station, according to a nurse's note.

F. Delivery

Dr. Finke returned to Donna's room at 7:35 p.m., in time to see another severe prolonged variable decel at 7:40 p.m. Donna's mother, Sally Ellis, was in the labor and delivery room and testified that Dr. Finke said: "Oh boy, she's got my attention. Let's get her out now." Dr. Finke performed a pelvic examination and determined that she needed to take action. She testified that at 7:50 p.m., she decided to proceed with a vaginal forceps delivery because of the severe prolonged decels.

Dr. Finke testified that, having determined that the baby had by then progressed to the plus one station and was low enough in the birth canal, she felt comfortable that the baby was about to progress to plus two station, and she could not predict whether further prolonged decels would occur. Dr. Finke described the 7:40 p.m. decel as the "end point" of her decision for action and agreed that there was "urgency" because of the large decels.

---

6. Nurse Fenton was the charge nurse in the hospital's labor and delivery unit until 7:00 p.m. that night; Nurse Sandy Stephens was the charge nurse from 7:00 p.m. through 7:00 a.m. the next morning.

Preparation for delivery included making warm towels and oxygen available for the baby, getting the delivery table ready, removing the catheter and monitor, scrubbing, removing the end of the bed and putting stirrups in place, and placing the mother's legs in the stirrups. Dr. Finke described how she would have first evaluated the station, felt the baby's head, "ghost[ed]" placement of the forceps outside the mother's body, and then placed each blade with one hand while guiding it into place beside the head with the other.

Dr. Finke applied the forceps at approximately 8:00 p.m. She testified that she would have held the forceps with two fingers of one hand on the handles, placed her other hand on top for a downward pressure to move the head under the pubic bone, and followed with an upward movement of the head to complete its negotiation out of the birth canal.

Donna's mother, Mrs. Ellis, and Donna's husband, Robert, observed the delivery. Mrs. Ellis described Dr. Finke as turning her body "like this" (demonstrating), putting her leg "up against the bed like this" (again demonstrating), and "pull[ing] a lot" and "with a lot of force." She said Dr. Finke "turned to the side and braced herself." Mrs. Ellis testified that Dr. Finke was pregnant and that her stomach was very large. She said Dr. Finke pulled with such force that "it scared me to death." She also said that it was like a "tug-of-war." Robert testified that Dr. Finke shifted her weight and put one foot "in front of the edge of the bed" and started "tugging on her [Madeline] as hard as she could." Then, he said, Dr. Finke "braced her foot on the end of the bed."

Robert testified that Madeline came out face-up; he could see Madeline's eyes pulled back by the forceps and her neck distended. He said Dr. Finke "couldn't have pulled her eyes back any further. . . . I thought her head was going to pop." He could see Dr. Finke "straining" and that Madeline was "all bloody" and bruised. Dr. Finke testified that she used "gentle traction" to deliver Madeline.

As Madeline's head emerged, a complication referred to as a "shoulder dystocia" developed, meaning that one of the baby's shoulders became stuck behind the pubic bone. Dr. Finke had two standard maneuvers performed to free Madeline's shoulder quickly. Using the "McRoberts" maneuver, the nurse pulled Donna's legs up to her chest to straighten the pelvis, and then she applied "suprapubic pressure" by downward vertical pressure of her doubled fist on Donna's abdomen.[7] The shoulder was released in seconds, and Madeline was born at 8:06 p.m. Also at 8:06 p.m., Dr. Finke obtained some cord blood from Madeline to determine Madeline's blood type and to test for compatibility with Donna's blood. An analysis of this cord blood sample showed Madeline's pH to be 7.32.[8] Dr. Finke's labor and delivery summary described the birth as a "low forceps delivery" for "severe variable decels."

### G. Condition at Birth

Madeline did not start breathing upon delivery. She had bruising on her face and head with an indentation and a cut described by her father and grandmother as a "big gash" near her left temple. This wound to Madeline's skull was so severe that it eventually required debridement.

7. See VandeStreek v. Hammer, No. 03–99–00355–CV, 2000 WL 963162, at *2 (Tex.App.-Austin July 13, 2000, no pet.) (not designated for publication) (discussing shoulder dystocia as well as McRoberts maneuver and suprapubic pressure).

8. The accuracy of this pH was hotly contested.

Madeline also had extensive bruising over her entire body.

While Dr. Finke delivered the placenta and performed an episiotomy to repair a third-degree tear of Donna's vagina that extended into the rectal muscle, Nurse Walker began "bagging" Madeline, placing a mask over Madeline's face, and pushing oxygen into her lungs using a squeeze valve. Within two minutes of birth, the neonatal intensive care unit (NICU) was also called "stat" to send a team to the delivery room.

Nurse Walker assigned Madeline a one-minute Apgar score of two. "Apgar" scores are assigned based upon heart rate, respiration, muscle tone, reflex, and skin color on a scale of zero to ten and measure a newborn's ability to adapt to extra-uterine life immediately after birth, at five minutes, and continuing until at least a score of seven is achieved. Madeline was given a one for heart rate, a zero for respiration, a one for muscle tone, a zero for reflex, and a zero for skin color. By four minutes, Madeline was switched to one hundred percent "blowby" oxygen. Nurse Walker assessed her five-minute Apgar score at six.

Upon arrival of the NICU team, Madeline was still pale and blotchy peripherally but was centrally "pink." The NICU nurse's note in Donna's labor and delivery report states that Madeline's "respirations were agonal"[9] when the team arrived. Consequently, the NICU team resumed "bagging" Madeline. Madeline was given briefly to Donna to hold and then transported to the NICU under the one hundred percent blowby oxygen.

### H. Treatment in NICU

9. Nurse Walker explained that "[a]gonal respirations would be gasping."

Dr. Scott Tisdell, a board certified neonatologist and director of the hospital's NICU, was called to treat Madeline at 8:20 p.m. because NICU nurses were concerned that she might have a skull fracture on the left side of her head from the forceps. Dr. Tisdell noted in his report of his examination of Madeline that "[t]here's a moderate indentation on the left side where the forceps were placed." He noted that Madeline had bruising in her right ear, bruising on her scalp and on the right and left sides of her head. Dr. Tisdell also noted that Madeline was developing unusual, extensive bruising on her head, ears, arms, and even her genitals. Tests later also revealed hematomas (internal bleeding) in her liver and adrenal gland. Based on the indentation on the left side of Madeline's head and the bruising on her skull and in her ear, Dr. Tisdell was concerned that Madeline may have suffered a skull fracture and intracranial hemorrhage. Dr. Tisdell ordered a CT scan, which ruled out that possibility.

Dr. Tisdell evaluated Madeline's oxygen status, perfusion, and degree of respiratory distress, examining her color, appearance, and breathing, and drawing his own arterial blood gas sample. Dr. Tisdell drew his arterial blood sample from Madeline twenty-four minutes after her birth, and it established that at that time her pH was 7.219. In his opinion, the pH reading from his blood gas sample indicated Madeline was "acidotic."[10]

Dr. Tisdell concluded that Madeline's perfusion was not good and that she was in moderate respiratory distress. Her breathing was labored enough that Dr. Tisdell thought she needed to be intubated; therefore, he intubated Madeline and administered bicarbonate to correct the

10. Dr. Tisdell said that acidotic means that there is some acid build up in the bloodstream.

acidosis. He also ordered packed red blood cells, Plasmanate, and fresh frozen plasma administered to Madeline in an amount equal to approximately one-third of her total blood volume to replace the blood she had lost during delivery from the developing hematomas and bruising.

Dr. Tisdell was also concerned with infection, based upon Madeline's temperature. Her rectal temperature was above 102 degrees, high for a newborn. He started Madeline on antibiotics, but he discontinued them after a few days when the cultures he ordered to test for various infections all came back negative. Further tests ruled out genetic metabolic abnormality, meningitis, and encephalitis. Madeline's breathing tube was removed on day three. Except for his continued opinion that Madeline had a subclinical infection and an episode of "apnea" (described as the "baby forgetting to breathe") on day nine, Dr. Tisdell testified that everything else had resolved, including the hematomas in Madeline's liver and adrenal gland. Dr. Tisdell discharged Madeline on the thirteenth day, sending her home with a monitor for apnea and CPR training for her parents.

## I. Alleged Damages

At home, Madeline choked easily during feedings and had to be held to prevent her from vomiting. She slept with the monitor for fifteen months. She failed to progress as a normal child. She was unable to walk without the aid of a walker until age three. At age two and a half, Madeline was diagnosed with cerebral palsy with developmental delay.

Madeline has an IQ of forty-eight; she is mentally retarded. At the time of trial Madeline was seven years old and was not toilet trained. She still experiences difficulty walking; her right leg becomes tired and drags. When she becomes tired, her right eye becomes cross-eyed. She has many other motor, learning, and behavioral disorders. The indentation on Madeline's left temple from the forceps is still present and visible, causing her face to lack symmetry and her glasses to not fit properly. Madeline will require extensive special education, therapies, and counseling. She will never be capable of independent living.

## J. Verdict and Judgment

After both sides rested and closed, the trial court granted the hospital and clinic a directed verdict on Plaintiffs' direct negligence claims. In answer to a broad-form submission, the jury found that the negligence of each of the remaining individual Defendants was a proximate cause of Madeline's injuries and apportioned liability sixty percent to Dr. Finke, twenty percent to Nurse Walker, fifteen percent to Nurse Stephens, and five percent to Nurse Fenton.

The jury awarded Madeline $1.8 million in damages for future loss of earning capacity; $3.5 million for future medical care and therapy after age eighteen; $60,000 for past pain and mental anguish; $1 million for future pain and mental anguish; $250,000 for past physical impairment; $1 million for future physical impairment; $25,000 for past disfigurement; and $500,000 for future disfigurement. The jury awarded the Morrells $160,000 for past medical, physical, speech, and occupational therapy expenses; $0 for future care expenses incurred before age eighteen; $2 million for loss of consortium; and $250,000 each for past mental anguish. The trial court granted Defendants a JNOV on the Morrells' claims for loss of consortium and mental anguish and otherwise rendered judgment on the verdict for a total of $12,131,153.42 jointly and severally against all Defendants.

### III. ISSUES PRESENTED

Robert and Donna Morrell complain in four issues that the trial court erred by granting JNOV on the damages for loss of consortium and mental anguish. Dr. Finke and the clinic complain in their first issue that there is no evidence or factually insufficient evidence that any negligence of Dr. Finke was a cause-in-fact of Madeline's injuries. By their second issue, they complain that there was no evidence or factually insufficient evidence of negligence. By their third issue, they contend that there is no evidence of the present value of the cost of Madeline's future medical expense, so that the jury's award of $3.5 million for that element of damages requires reversal and remand or remittitur. In their fourth issue, they complain that the findings of past medical expenses are excessive.

The nurses and hospital complain in four issues that there is legally and factually insufficient evidence that the nurses' breaches of the standard of care (which they do not contest) were a cause-in-fact of Madeline's injuries, and they join in the complaints of Dr. Finke and the clinic regarding the past medical expenses and future care findings. The nurse Defendants further complain that Robert and Donna Morrell's claim for past medical expenses against them is barred by limitations. Nurse Fenton also contends that she should only be held severally liable for the five percent negligence the jury attributed to her.

### IV. THE MORRELLS' APPEAL

#### A. Loss of Consortium

■ In their first and second issues, Robert and Donna Morrell contend that the trial court erred by granting a JNOV concerning their loss of consortium claim against all Defendants. After submission, however, the Supreme Court of Texas decided *Roberts v. Williamson,* 111 S.W.3d 113 (Tex.2003), which the Morrells acknowledge is contrary to their position. *See id.* at 119 (holding parents not entitled to damages for loss of consortium based on serious permanent injuries to child who has not died). Accordingly, we overrule the Morrells' first and second issues.

#### B. Bystander Recovery for Mental Anguish

■ In their third and fourth issues, the Morrells contend that the trial court erred by granting a JNOV on their claim against all Defendants for bystander recovery for past mental anguish as the result of witnessing their child's serious permanent injury at birth. The Morrells rely on *Birchfield v. Texarkana Memorial Hospital,* 747 S.W.2d 361, 364–65 (Tex.1987), arguing that the supreme court in that case recognized a parent's entitlement to mental anguish resulting from serious permanent injury to a child by letting stand the jury's award of that element of damages.

■ Appellees respond that the propriety under Texas law of recovering mental anguish damages was not challenged in *Birchfield* and that the supreme court did not address such a right in that case by parents for injury to a child. Appellees contend that the supreme court directly addressed and rejected a bystander claim by a husband for mental anguish damages arising from his wife's injury in connection with an emergency C-section delivery in *Edinburg Hospital Authority v. Trevino,* 941 S.W.2d 76, 81 (Tex.1997) (holding that "Texas'[s] bystander cause of action precludes bystander recovery in medical malpractice cases"). We agree with Appellees that the Morrells' claim is controlled by *Edinburg,* which precludes recovery of bystander mental anguish damages in a medical malpractice case as a matter of law. Accordingly, we overrule the Morrells' third and fourth issues.

We hold that the trial court correctly granted Defendants' motions for JNOV and correctly declined to include in the judgment the $2.5 million dollars in ·damages found by the jury for Robert's and Donna's loss of consortium and mental anguish.

## V. DR. FINKE AND THE CLINIC'S APPEAL AND THE HOSPITAL AND NURSES' APPEAL

### A. Sufficiency of Negligence and Cause–in–Fact Evidence

Dr. Finke and the clinic claim in their first issue that the evidence is legally and factually insufficient to establish that any negligence by Dr. Finke was the cause-in-fact of any of Madeline's injuries and in their second issue that no testimony exists as to the standard of care for Dr. Finke or whether she breached that standard when she returned to Donna's delivery room after delivering another baby. The nurses and hospital likewise complain in their first issue that there is legally and factually insufficient evidence that their negligence was a cause-in-fact of Madeline's injuries.

### 1. Standards of Review

In determining a "no evidence" issue we are to consider only the evidence and inferences that tend to support the finding of the disputed fact—unless a reasonable juror could not give credit to such evidence or inferences. See City of Keller v. Wilson, 168 S.W.3d 802, 827 (Tex.2005). We are to disregard all evidence and inferences to the contrary to the disputed fact—unless a reasonable juror could not disregard such evidence or inferences. Id. But we are not to weigh the evidence or make our own credibility determinations. See id.; Bradford v. Vento, 48 S.W.3d 749, 754 (Tex.2001); Cont'l Coffee Prods. Co. v. Cazarez, 937 S.W.2d 444, 450 (Tex.1996); In re King's Estate, 150 Tex. 662, 244 S.W.2d 660, 661 (1951). Anything more

than a scintilla of evidence is legally sufficient to support the finding. Cont'l Coffee, 937 S.W.2d at 450; Leitch v. Hornsby, 935 S.W.2d 114, 118 (Tex.1996). More than a scintilla of evidence exists if the evidence furnishes some reasonable basis for differing conclusions by reasonable minds about the existence of a vital fact. Rocor Int'l, Inc. v. Nat'l Union Fire Ins. Co., 77 S.W.3d 253, 262 (Tex.2002).

An assertion that the evidence is "insufficient" to support a fact finding means that the evidence supporting the finding is so weak or the evidence to the contrary is so overwhelming that the answer should be set aside and a new trial ordered. Garza v. Alviar, 395 S.W.2d 821, 823 (Tex. 1965). We consider all of the evidence in the case in making this determination. Mar. Overseas Corp. v. Ellis, 971 S.W.2d 402, 406–07 (Tex.), cert. denied, 525 U.S. 1017, 119 S.Ct. 541, 142 L.Ed.2d 450 (1998).

In a medical malpractice case, the plaintiff is required to show evidence of a reasonable medical probability that the injury was proximately caused by the negligence of the defendant. Park Place Hosp. v. Estate of Milo, 909 S.W.2d 508, 511 (Tex.1995); Duff v. Yelin, 751 S.W.2d 175, 176 (Tex.1988). There are four elements to be proved: (1) a duty by the physician/nurse/hospital to act according to applicable standards of care; (2) a breach of the applicable standard of care; (3) an injury; and (4) a causal connection between the breach of care and the injury. Denton Reg'l Med. Ctr. v. LaCroix, 947 S.W.2d 941, 950 (Tex.App.-Fort Worth 1997, writ denied).

To establish proximate cause, the plaintiff must prove (1) foreseeability and (2) cause-in-fact. Leitch, 935 S.W.2d at 118–19; Marvelli v. Alston, 100 S.W.3d 460, 469 (Tex.App.-Fort Worth 2003, pet.

denied). The ultimate standard of proof on cause-in-fact is whether by a preponderance of the evidence, the negligent act or omission is shown to be a substantial factor in bringing about an injury, without which the harm would not have occurred. *Park Place Hosp.*, 909 S.W.2d at 511 (quoting *Kramer v. Lewisville Mem'l Hosp.*, 858 S.W.2d 397, 400 (Tex.1993)); *Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 477 (Tex.1995).

■ The plaintiff must establish a causal connection between the defendant's negligence and the injuries based upon a "reasonable medical probability" and not upon mere conjecture, speculation, or possibility. *Park Place Hosp.*, 909 S.W.2d at 511; *Lenger v. Physician's Gen. Hosp.*, 455 S.W.2d 703, 706 (Tex.1970); *Marvelli*, 100 S.W.3d at 470. The plaintiff satisfies the cause-in-fact element of proximate cause by presenting proof establishing a direct causal connection between the damages awarded, the defendant's negligence, and the injury suffered. *Texarkana Mem'l Hosp., Inc. v. Murdock*, 946 S.W.2d 836, 838 (Tex.1997).

■ The issue of causation is usually for the trier of fact in medical malpractice cases when (1) general experience and common sense will enable a layman fairly to determine the causal relationship between the event and the condition, (2) scientific principles, usually proved by expert testimony, establish a traceable chain of causation from the condition back to the event, or (3) a probable causal relationship is shown by expert testimony. *Lenger*, 455 S.W.2d at 706; *see Marvelli*, 100 S.W.3d at 470.

### 2. Expert Testimony

Over the course of the five-week trial, the jury heard from sixteen expert witnesses. Plaintiffs relied upon the testimony of Corrine LaMont, R.N.C., a certified obstetrical nurse, and upon the testimony of the defendant nurses to establish the standard of care and deviations from the standard of care for the nurses. For the standard of care and deviations alleged against Dr. Finke, they relied upon the testimony of Dr. James P. Rice, an obstetrician/gynecologist. Dr. Stewart B. Ater, a pediatric neurologist, was Plaintiffs' expert witness on causation as to Madeline's injuries and on her current condition. Dr. Kendall Jones, a pediatric neuroradiologist, interpreted MRI and CT scans on behalf of Plaintiffs.

Dr. Finke and the three defendant nurses testified in their own behalf and, in addition, relied upon the testimony of Barbara True–Driver, a high-risk maternal nurse; Dr. Peter VanDorsten, an obstetrician/gynecologist specializing in maternal-fetal medicine; and four health professionals who treated Madeline at the hospital: Robin White, Director of Respiratory Care; William Gilmer, respiratory therapist on the NICU team that assumed care of Madeline at birth; Dr. Scott Tisdell, the neonatologist in the NICU unit; and Dr. Gilbert Vezina, a pediatric neuroradiologist, who interpreted the CT and MRI scans for Defendants.

Nurse LaMont testified that Madeline's fetal heart monitor strip was "nonreassuring" from the start because under the criteria set forth in the hospital's fetal heart monitoring policy it documented no accelerations and no beat-to-beat variability. Nurse LaMont explained that the nurses failed to assess the fetal heart monitor strip accurately and failed to evaluate it in accordance with hospital standards. Nurse LaMont acknowledged that even normal labor stresses a fetus, but explained that variable and late decels indicate decreased oxygenation and have the potential of reducing the baby's reserves. Over time, she said, a chronic decrease in

oxygenation can make it harder for the baby to tolerate labor. In her opinion, and based on the hospital's fetal heart monitoring policy, the strip never showed adequate accelerations or good beat-to-beat variability and reflected numerous and steadily worsening variable and late decels.

Nurse LaMont believed Madeline began developing oxygen deficit beginning at 4:40 p.m. In her opinion, the nurses deviated from the standard of care in five different respects: by failing to accurately assess the fetal heart monitor strip; by failing to accurately intervene based on the problems documented on the strip; by failing to provide timely care to Donna; by failing to access the chain of command to get timely care for Madeline and Donna; and by failing to properly resuscitate Madeline after birth.[11]

Dr. Rice, board certified in obstetrics with a general obstetrical practice, was also a clinical instructor at the University of Washington Medical Center. Dr. Rice testified for Plaintiffs as to the standard of care for Dr. Finke. Based on the fetal heart monitor strip, charts, and other hospital records, he testified that Dr. Finke deviated from the standard of care of an obstetrician by failing to perform a timely C-section. In Dr. Rice's opinion, the fetal heart monitor strip was "reassuring" until about 5:10 p.m. In his opinion, the strip became "nonreassuring" from 5:20 p.m. until 7:15 p.m. From 7:15 p.m. on, Dr. Rice characterized the tracing as "ominous" and said, "you have to really be worried now if the baby is not getting into severe trouble." The 7:15 p.m. decel, he said, was a very "worrisome" prolonged decel that was significant. After the prolonged decel at

7:15 p.m., he said that the standard of care at least required preparation of the room to get ready for a C-section. Dr. Finke violated the standard of care by not starting to prepare for a possible C-section at that time.

Dr. Rice further testified that, based on the entire course of Donna's labor and Madeline's condition, the standard of care required Dr. Finke to make the decision to perform a C-section at 7:27 p.m. He testified that Dr. Finke violated the standard of care by not deciding to perform and not performing a C-section at that point. Dr. Rice testified that the nurses' notes at 7:25 p.m. indicate that Madeline was still at a zero station,

and that the standard of care would be to perform a cesarean section.... You know, we also have a baby that's been stressed out already, is having a very difficult time, and I think that there would be a high risk of the baby not being able to tolerate anything that would be involved with this difficult of a forceps delivery.

By that time, he testified that the standard of care was "that this baby needs to have a cesarean section to be delivered. You need to have the baby out as soon as possible."

Dr. Rice explained that in a forceps delivery, pressure is applied to the baby, and if there has been a problem with the cord, continued interruptions of the blood supply may occur while the baby is being brought out through the vagina. Therefore, Dr. Rice said that the standard of care "absolutely" required a physician to avoid further stressing this baby through a vaginal delivery. The failure to perform a cesarean section as well as the additional

11. The nurses do not challenge the sufficiency of the evidence to establish these breaches of the standard of care or to establish the foreseeability element of proximate cause. The nurses challenge only the sufficiency of the evidence concerning the cause-in-fact element of proximate cause explicitly found by the jury in its negligence findings against them.

mechanical stress of the forceps delivery were, according to Dr. Ater, proximate causes of the injuries sustained by Madeline.

By 7:42 p.m., after the second prolonged severe decel, the standard of care, in Dr. Rice's opinion, required that the baby should already have been born, "[b]ut certainly, at this point in time, this baby needs to be born. . . . Ideally by a very rapid cesarean section [that has] already been set up." Dr. Rice said that if the nurses had prepared for a C-section, it would take about five minutes to wheel the mother to the operating room, pour on some antiseptic, drape her, and begin the C-section with a general anesthetic, and in this emergency situation, it would then take about two minutes to get the baby out.

Dr. Peter VanDorsten, board certified in obstetrics and gynecology with a subspecialty in high-risk maternal-fetal medicine, testified as an expert for Dr. Finke that the mechanism causing severe variable decels, such as those at 7:15 p.m. and 7:40 p.m. is believed to be "compression of the [umbilical] cord" that causes the heart to slow down. Although Dr. VanDorsten agreed with Dr. Rice that the 7:15 p.m. decel was cause for alert that the cord was "vulnerable" with a potential for total compression, he disagreed that a decision should have been made by 7:27 p.m. to deliver by C-section. The mother was pushing and, in his opinion, there was no reason to expect another severe decel. He interpreted the fetal heart monitor strip as showing mild decels with contractions superimposed by pushing by the mother. The question, he said, was whether they were "bothering the fetus." In his opinion, the baby was still "totally normal at this point."

Dr. VanDorsten agreed that the second decel at 7:40 p.m. was "sinister" and that

the baseline of the heart rate was significantly different afterwards. The baby "can't handle" this one, he said. That decel required Dr. Finke's assessment, but he still did not believe it required an immediate C-section. In his opinion, it was appropriate for Dr. Finke to ask Donna to push a few more times while she assessed the situation. You are "wishing that she'd push the baby out," but OP labor "take[s] longer." He saw no indications of hypoxia from the strip and nothing to indicate a progressive loss of reserves of the baby. In his opinion, Dr. Finke's decision to effect delivery of the baby after the second decel by forceps vaginal delivery, rather than by C-section, was within the standard of care.

The parties' experts disagreed not only on their interpretations of the fetal heart monitor strip and the standard of care it necessitated but also concerning the nature, cause, and origin of Madeline's neurological injuries. Dr. Jones, Plaintiffs' neuroradiologist, reviewed the CT scan taken two hours after Madeline's birth, a September 12, 1997 MRI taken when Madeline was two and a half years old, a November 27, 2000 MRI taken when Madeline was almost seven years old, and Madeline's clinical history. Dr. Vezina, the Defendants' pediatric neuroradiologist, likewise reviewed these films. Both Dr. Jones and Dr. Vezina agreed concerning the objective findings in the films, but they drew different conclusions from those findings.

Dr. Jones testified that the CT scan after Madeline's birth revealed a "little bit" of birth trauma with some swelling and some molding of the skull. He saw no hemorrhage, congenital deformities, or edema. He would not expect the CT scan done two hours after birth to document hypoxia.

Dr. Jones next reviewed the MRI performed in 1997 and testified that it showed abnormal increased signal around the ventricles, raising a concern about periventricular leukomalacia (PVL), most commonly caused in term babies by hypoxic ischemic encephalopathy.[12] PVL is an abnormal development of the white matter next to the ventricle. Dr. Jones explained that since Madeline was only about two years old at the time of the 1997 MRI, the finding could be simply an instance of immature myelination that would resolve itself. He explained, however, that when immature myelination occurs it usually is visible equally on both the left and right sides of the brain, not as in Madeline's MRI, only on the left side. Consequently, in his opinion, because the finding was not symmetrical, it was more likely a finding of some type of PVL. The most common cause of PVL in a term infant is a hypoxic or lack-of-oxygen injury at the time of birth.

Madeline's November 27, 2000 MRI confirmed an asymmetric finding that Dr. Jones considered "very characteristic, even more characteristic than the earlier MRI, of what one would see with periventricular leukomalacia," "this pattern is quite typical and characteristic of what you see in hypoxic ischemic disease." Additionally, he said that Madeline's clinical history presented a picture consistent with hypoxic ischemic induced PVL: Madeline was born acidotic and had hypotonia, seizures, apnea, and had low Apgar scores—all findings Dr. Jones commonly sees with babies who have suffered a hypoxic injury. Dr. Jones testified that all of Madeline's symptoms and the results of the tests performed upon her are consistent with a hypoxic brain injury.

By contrast, Dr. Vezina testified that the films showed no evidence of any hypoxic ischemic event when Madeline was born. He agreed that the two-hours-after-birth CT scan would not show any hypoxia; it was too soon. But he testified that a January 5, 1995 ultrasound and an April 5, 1995 CT scan likewise show no evidence of a hypoxic birth injury. According to Dr. Vezina, the September 1997 MRI did not show any atrophy or scarring of the brain, two features one would expect to see following a hypoxic event. He said that the white spot noted as PVL by Dr. Jones was simply immature myelination. He testified that, in the term infant, PVL is usually not caused by a hypoxic ischemic event at birth;

> most of the time what you find is that there was no hypoxic ischemic event at the time of delivery, at the time of term. And oftentimes what we try to find with varied success are insults or things that happened during pregnancy when the fetus is much younger before 34, 35 weeks gestation.

Finally, concerning the November 2000 MRI, Dr. Vezina testified that the remaining white spot is a "small" "non-specific" area, but not PVL. He said he "doubt[s]" this small spot of brain injury has caused or contributed to Madeline's developmental delays.

Dr. Ater, Plaintiffs' causation expert, testified that in reasonable medical probability Madeline's brain injury occurred during the forceps delivery. In his opinion, the proximate cause of Madeline's brain injury was forceps birth trauma in conjunction with hypoxic ischemic insults she suffered during both labor and delivery, compounded by her significant loss of

12. Dr. Ater explained that "ischemic" refers to inadequate blood flow leading to hypoxia in the tissue. "Encephalopathy" is injury to the brain cells. The "periventricular" area is the area next to one of the ventricles of the brain. "Malacia" means abnormal development.

blood volume due to the bruising and hematomas she experienced.[13]

Dr. Ater testified and demonstrated that when a person pushes on his hand or his fingernail bed, it gets white because the pressure temporarily decreases the blood flow to the area; when the pressure is released, the area becomes red again as blood flows back into it. He explained that this is what happened to Madeline's brain when Dr. Finke applied the forceps; Madeline's head is still, over six years later, indented on the left side where the forceps prong was placed. This severe pressure on the left side of Madeline's skull pushed in on the left side of her brain and exerted pressure. Dr. Ater testified that because, prior to the forceps delivery beginning at about 4:40 p.m. and continuing through delivery, Madeline suffered repeated hypoxic insults and was losing blood volume from internal bleeding, the mechanical traumatic insult of the ten to fifteen minutes of forceps pressure decreased the blood supply to that part of her brain and "was the straw that broke the camel's back." He testified that Madeline suffered hypoxia induced PVL on the left side of her brain corresponding to the location on her left temple where pressure was applied and the forceps indentation remains. Dr. Ater explained that Madeline's second, 2000 MRI "ruled out" other possible causes of Madeline's brain injury. Madeline's PVL is located in an area of the brain responsible for leg control and, because the left side of the brain controls the right side of the body, Dr. Ater said that the PVL explains Madeline's gait-she drags her right leg when she walks. Dr. Ater testified that Madeline will continue to suffer substantial permanent neurological injuries.

Dr. Tisdell, the treating neonatologist in the NICU, was of the opinion that in reasonable medical probability the cause of Madeline's symptoms was an infection, not hypoxia or asphyxia. Dr. Tisdell testified that all of the negative cultures did not rule out some subclinical infection. The bad outcome, he said, was more likely caused by a subclinical infection.[14] He testified that babies can have serious morbidity, even death from infection, even though cultures are negative.

Dr. Tisdell further testified that the pH value of 7.32 for the blood Dr. Finke drew immediately after birth was "perfect" for oxygenation at the time of birth and precluded perinatal asphyxia.[15] He testified that the indented bruise near Madeline's left temple would not be unusual for a forceps delivery and, in his opinion, it did not equate to brain damage. Madeline's acid build-up, in his opinion, was metabolic and not indicative of acidosis or asphyxia at birth. It could mean a metabolic defect, congenital or chromosomal problems, or infection. Additionally, he said, he would have expected seizures from any brain damage at birth within the first twenty-

**13.** Dr. Ater testified for three days. His testimony is set forth in four volumes of the reporter's record. Dr. Ater explained in depth—through slides presented to the jury—the increasingly severe physical impact of the hypoxic insults suffered by Madeline throughout labor and delivery and the physical consequences of Madeline's loss of fetal reserves on her body, organs, and brain.

**14.** Dr. Ater testified that a subclinical infection is an infection that "comes and goes and their immune system deals with it and they

don't have any clinical signs of that infection." He said that Madeline obviously did have clinical signs and symptoms—which are documented in her NICU records, and which are the reason cultures were performed—so that by definition she did not have a "subclinical infection."

**15.** A fact issue, discussed supra, arose at trial concerning whether this pH result from the blood obtained by Dr. Finke was accurate.

four hours, which he claimed Madeline did not manifest. He also consulted with Dr. Laney, a pediatric neurologist, who did not assess Madeline as having asphyxia at birth.[16]

Dr. VanDorsten also disagreed with Dr. Ater's opinion that cumulative, increasingly severe hypoxic ischemic insults combined with trauma from the vaginal forceps delivery were the cause of Madeline's neurological deficits. In reasonable medical probability, in his opinion, Madeline's current condition is not related to Dr. Finke's care. Likewise, Dr. Finke and the defense experts in obstetrics, pediatric neurology, and pediatric neuroradiology all testified that Madeline's neurological condition did not result from perinatal hypoxic ischemic injury or from any other aspect of labor or delivery.

All experts agreed that the cause of cerebral palsy remains unknown in a large percentage of cases. Numerous causes for cerebral palsy exist, including infections such as rubella, herpes, and other bacterial and viral infections during pregnancy, and many types of genetic causes, metabolic causes, chromosome changes, exposure to chemical toxins, insults at earlier times in pregnancy, and prematurity. Dr. Ater acknowledged that despite the research and efforts over the past decade or more, the percentage of cerebral palsy is not getting better, as more sick and premature babies are surviving.

The American College of Obstetricians and Gynecologists ("ACOG") has issued "Bulletin 163" setting forth criteria to assist in determining whether labor-and-delivery hypoxia has caused cerebral palsy. Those criteria are (1) a low Apgar score of zero to three for more than five minutes, (2) seizures and or hypotonia within the first twelve to twenty-four hours, (3) multi-level system failures, and (4) an umbilical cord arterial blood sample with a pH less than 7.0.[17] Defendants and their experts claim that none of these criteria were met in the present case; Madeline's five-minute Apgar score was 6, she had no seizures or hypotonia within the first twelve to twenty-four hours, she had no multi-level system failures, and she had a pH of more than 7.0.

Plaintiffs' experts asserted that Madeline did meet the ACOG criteria. Nurse Walker gave Madeline a five-minute Apgar score of 6.[18] But Nurse LaMont testified that Apgar scores are "subjective" and that "there are times when people will be a little generous on these scores, for whatever reason, and that can indeed increase the Apgar score, and it might—in my hands or your hands, it might be two different scores." Dr. Ater testified that Madeline's five-minute Apgar score was "generous"; "this baby needed resuscitation including ventilation [by the NICU team]. One of the scores was for breathing. It doesn't make sense. I mean, I'm not sure how they scored that baby was breathing when they were giving bag and mask artificial ventilation." He said that "[a] baby who is so depressed that it can't even breath [sic]

16. "Asphyxia" is tissue damage that occurs when the cell processes break down from lack of oxygen-producing lactic acid ("acidosis").

17. The hospital's policies categorize a pH of 7.21 or lower as acidotic. Dr. VanDorsten testified that this pH standard is "archaic," said that it "doesn't represent modern science," and said that the jury should disregard it.

18. At five minutes of age, Madeline's heart rate was above 100 beats per minute, so Nurse Walker scored her two. Madeline had "some attempts" at breathing, so she received one point for respiratory effort. She received one point for muscle tone, one point for reflex, and one point for skin color.

is not going to have all these reactions and motor movements" required to obtain Apgar points for muscle tone, reflex, and skin color.

Dr. Ater and Nurse LaMont both testified that Madeline did have hypotonia when she was born. And after she was born, for the first three days of her life, Madeline was intubated, on a respirator, and either paralyzed with a drug called Pavulon, so that she could not fight against the respirator breathing for her, or heavily sedated. Therefore, Dr. Ater said there is no way to know whether, if unparalyzed and unsedated, Madeline would have experienced seizures; the drug-induced paralysis and heavy sedation prevented any seizures. Madeline did suffer multi-level system failures from her delivery; she suffered internal bleeding, creating hematomas on her adrenal gland and liver. And finally, Plaintiffs contended that, in fact, Madeline's pH level at birth was much lower than 7.32, around 6.9 to 7.1.

Plaintiffs contend that the blood obtained by Dr. Finke showing a 7.32 pH was not properly drawn for pH testing. Plaintiffs' experts testified that obtaining an accurate pH reading from cord blood requires the use of a hepranized syringe inserted into the umbilical cord's artery and requires that the drawn blood sample be placed on ice during transport for testing. The labor and delivery summary signed by Dr. Finke indicates that she took cord blood from Madeline to test it for blood type and compatibility with Donna's blood, not to test it for pH. Drawing umbilical cord arterial blood takes more than one minute, yet Dr. Finke wrote in her labor and delivery summary that she took this blood during the same minute that Madeline was born, 8:06 p.m. Type and compatibility testing, however, may be accomplished with a blood sample drained from the cut and clamped cord; a procedure that may be performed easily in less than a minute. Consequently, Plaintiffs asserted at trial that the 7.32 pH result was inaccurate because it was performed on mixed arterial and venus cord blood intended to be used for type and compatibility testing, not pH testing. Dr. Finke's expert, Dr. VanDorsten, agreed that venus blood is "meaningless" in determining pH; pH must be determined from arterial blood. If the cord gas sample had been properly drawn from the cord's artery, Nurse LaMont "would expect it to be a lot lower than 7.2."

According to Dr. Ater, Dr. Tisdell's pH reading of 7.219 is inconsistent with Madeline having a 7.32 pH at birth; after Madeline had been bagged and given one hundred percent blowby oxygen for twenty-four minutes, her pH level should have risen, not gone down.[19] Dr. Ater opined that, considering the extensive resuscitation efforts performed on Madeline during the first twenty-four minutes of her life and "reasoning backwards," or "extrapolat[ing] back to birth," Madeline's pH at birth was between 6.9 and 7.1, "in the range where so many of these studies show that asphyxia occurs." Finally, Dr. Ater believed that although the ACOG bulletin criteria were useful, they were not exclusive and should not be used to rule out hypoxia because "[u]nder these criteria all you have to fudge or torque, the only things that have to be altered would be missing blood gas or an erroneous blood gas and generous Apgar score." Dr. Ater pointed out that the author of an authoritative textbook agreed with his position that the ACOG's bulletin criteria are advisory only, not exclusive.

19. Increased oxygenation improves pH, raises it.

### 3. Dr. Finke—Evidence of Negligence and Cause-in-Fact[20]

█ Dr. Finke argues that there is a "fatal gap" in the chain of causation because Dr. Ater's opinions on causation were never linked to any breach of the standard of care constituting negligence by Dr. Finke as testified to by Dr. Rice. As discussed below, the record before us contains evidence that Dr. Finke's negligence in failing to perform a C-section proximately caused Madeline's injuries.[21]

Dr. Rice testified, as outlined previously, that based on the fetal heart monitor strip, charts, and other hospital records, Dr. Finke deviated from the standard of care of an obstetrician by failing to perform a timely C-section and by proceeding with a vaginal delivery. Dr. Rice explained that the standard of care required Dr. Finke to prepare for a possible C-section after the prolonged decel at 7:15 p.m., and that Dr. Finke violated the standard of care by not preparing at that time for a possible C-section. Dr. Rice testified that by 7:27 p.m. the standard of care required a decision to perform a C-section and that Dr. Finke violated the standard of care by not deciding to perform and by not performing a C-section at that point and by then proceeding with a vaginal delivery.

According to Dr. Ater, the failure to perform a C-section resulted in a vaginal forceps delivery, which proximately caused the injuries sustained by Madeline. Dr. Ater testified that Madeline lost her reserves based on the cumulative hypoxic ischemic insults occurring from about 5:10 p.m. onward so that she had inadequate reserves and oxygenation to sustain her through the vaginal forceps delivery; Madeline's brain damage occurred "during the relatively prolonged forceps delivery ... [a]nd it wasn't just a very short one minute of time the way you deliver a regular baby. That was about 10 or 15 minutes worth." Dr. Ater repeatedly explained that the vaginal forceps delivery "was the straw that broke the camel's back." He testified,[22]

We know that she [Madeline] had significant mechanical injury [from the forceps]. The chart is full of documentation that people think that the forceps delivery caused the edema of the skull, the bleeding, the laceration of the ear.

They were even so concerned about the changes in the shape of the skull that they were concerned about a possible skull fracture and they had consultants consulting about a possible skull fracture.

It didn't turn out, but the point is, there was substantial amount of molding and I think that the molding may have caused some localized changes. Again, I think that in a normal patient who has forceps, you don't have this serious

---

**20.** The clinic joins Dr. Finke in appealing from the judgment. Because the clinic was held liable only under the doctrine of *respondeat superior* and its liability is contingent upon that of Dr. Finke, for simplicity we will refer only to her in our discussion.

**21.** Because the record supports the jury's negligence and proximate cause findings concerning this alleged breach of the standard of care, we do not address the other breaches alleged by Plaintiffs to alternatively support the jury's findings. We do not address whether Dr. Finke breached the standard of care in the way she performed the forceps delivery, as the dissent apparently believes; because the standard of care required a C-section, no vaginal delivery should have been performed at all.

**22.** Dr. Finke objected to this testimony on the ground that Dr. Ater was not qualified to testify concerning the standard of care for an obstetrician. The trial court overruled the objection. But we do not consider this testimony as standard of care evidence, only as causation evidence.

problem when forceps are appropriately applied.

However, in this patient where there was already a hypoxic-ischemic pre-existing insult, by adding this additional mechanical traumatic insult, I think that the consequence to the brain was that the blood supply in that area that was getting pushed on decreased and it set the brain up for this PVL. And it all fits with what we see. It fits with the MRI scan. It fits with her clinical status.[23]

. . . .

I believe this occurred during the latter ten minutes of birth. I believe that at that point the child lost her reserves and in addition to the cumulative damage of all the hypoxia and ischemia she had, then she lost blood volume due to bleeds, and I believe it was a process that didn't occur exactly at one specific minute, but it was getting worse and worse and worse, and I believe the injury occurred during the process of delivery, the instrumented forceps delivery when the trauma occurred.[24]

There is nothing else that fits this. This just fits hypoxic ischemic encephalopathy so perfectly that it's—I cannot think of anything that comes even close to explaining her problem given all of . . . the clinical symptoms, the laboratory symptoms. We know the cause. We know documented evidence of hypoxic ischemia. This whole thing fits so well with hypoxic ischemic encephalopathy that I can't think of any other diagnosis that really makes sense.

It is undisputed that if Dr. Finke had decided to perform a C-section at 7:27 p.m. in compliance with the standard of care, as testified to by Dr. Rice, Madeline would not have experienced the prolonged vaginal forceps delivery that Dr. Ater concluded proximately caused her brain damage.[25]

Dr. Finke points out that at 7:27 p.m. she was not in Donna's room; she was across the hall delivering another baby. She claims that no expert testimony exists as to the standard of care when she returned to Donna's room at 7:35 p.m. But Dr. Rice testified that from 7:27 p.m. onward, Madeline was so "stressed" that the standard of care from that point forward "absolutely" required a C-section to avoid further stressing her through a vaginal delivery. Dr. Rice testified that at 7:42 p.m. the standard of care dictated that a C-section, which already should have occurred, be performed immediately.[26]

23. Dr. Ater provided this testimony on direct examination, before any cross-examination when the dissent contends he purportedly learned of Dr. Rice's opinions.

24. This is not, as the dissent asserts, an inference of causation; it is direct medical expert causation evidence.

25. Citing General Motors v. Iracheta, the dissent contends that we have strung together pieces of unmatched expert opinion testimony linking the breach-of-the-standard-of-care expert testimony concerning Dr. Finke with the expert causation testimony concerning Dr. Finke. 161 S.W.3d 462, 469–70 (Tex.2005). A plaintiff is allowed, however, to utilize different experts to establish standard of care, breach, and causation. See, e.g., TEX. CIV.

PRAC. & REM CODE 74.351(I) (Vernon Supp. 2004–05) (permitting different expert reports on liability and causation). This is not a case like Iracheta where fatally conflicting causation testimony exists by the plaintiff's two causation experts. See Iracheta, 161 S.W.3d at 469–70 (recognizing plaintiff's expert Eduardo Sanchez's causation testimony conflicted irreconcilably with plaintiff's expert John Stilson's causation testimony). Dr. Rice testified as to the standard of care and Dr. Finke's breach of that standard—the failure to perform a C-section—while Dr. Ater testified that a proximate cause of Madeline's injuries was the failure to perform a C-section.

26. Because the dissent asserts that we have incorrectly characterized Dr. Rice's testimo-

Therefore, the record does contain expert testimony concerning the standard of care for Dr. Finke from 7:27 p.m. onward, including 7:35 p.m.

Thus, considering the evidence and inferences favorable to the jury's negligence and proximate cause findings concerning Dr. Finke that a reasonable juror could credit and disregarding all evidence and inferences to the contrary because a reasonable juror could, the evidence is legally sufficient to support these findings. Dr. Rice's testimony that Dr. Finke was negligent in failing to decide at 7:27 p.m. to perform a C-section and Dr. Ater's testimony that by 7:27 p.m.—because Madeline had suffered cumulative, increasingly severe, hypoxic ischemic insults for hours; she had lost her fetal reserves to the extent that she could not withstand a vaginal forceps delivery; and the prong of the forceps clamping down on her left temple prevented adequate oxygenation and caused her PVL—constitutes more than a scintilla of evidence supporting the jury's findings. *See Lenger,* 455 S.W.2d at 706; *see also Marvelli,* 100 S.W.3d at 470. This evidence establishes by expert testimony that, but for Dr. Finke's negligent failure to perform a C-section, the vaginal forceps delivery and consequently Madeline's brain damage would not have occurred; it establishes by expert testimony a probable

causal relationship between Dr. Finke's negligence and the injury Madeline suffered. *See Park Place Hosp.,* 909 S.W.2d at 511; *Lenger,* 455 S.W.2d at 706; *Marvelli,* 100 S.W.3d at 469; *see also Burroughs Wellcome Co. v. Crye,* 907 S.W.2d 497, 499 (Tex.1995) (recognizing that causation is established by proving defendant's conduct caused event that caused the plaintiff to suffer compensable injuries).

Applying the factual sufficiency standard of review to the evidence, we consider all of the evidence to determine whether the evidence supporting the jury's negligence and proximate cause findings concerning Dr. Finke is so weak or the evidence to the contrary so overwhelming that the answers should be set aside and a new trial ordered. *Mar. Overseas Corp.,* 971 S.W.2d at 406–07; *Garza,* 395 S.W.2d at 823. During the Plaintiffs' case, an obstetrician/gynecologist, Dr. Rice, testified that Dr. Finke was negligent in failing to timely decide to perform a C-section, in failing to perform a C-section at all, and in proceeding with a vaginal, forceps delivery. A pediatric neuroradiologist, Dr. Jones, reviewed Madeline's MRI and CT scans and testified that Madeline had PVL. And, a pediatric neurologist, Dr. Ater, testified that Madeline's PVL was

---

ny, we set forth below one specific, pertinent question and answer exchange:

Q. For a baby that's been stressed as you've been showing us through here · [the fetal heart monitor strip up to 7:27 p.m.], would that be one of the reasons to avoid adding more stress through a vaginal delivery?

A. Absolutely. Absolutely.

Q. And would standard of care require the physician to make that decision?

A. Yes.

Q. Now, Doctor, we're up here to 7:30 [p.m. on the fetal heart monitor strip] ... This testimony, as well as other testimony by Dr. Rice, clearly supports the sentence in our

opinion that the dissent claims to be an incorrect characterization of Dr. Rice's testimony: "But Dr. Rice testified that from 7:27 p.m. onward, Madeline was so 'stressed' that the standard of care from that point forward 'absolutely' required a C-section to avoid further stressing her through a vaginal delivery." The dissent superimposes its own view of the evidence on this testimony and apparently contends that by simply waiting until 7:50 p.m. to prepare for a vaginal forceps delivery Dr. Finke's decision to perform a vaginal forceps delivery somehow became not a breach of the standard of care.

caused by the traumatic forceps delivery of a baby whose fetal reserves had been depleted and who had suffered repeated hypoxic events, documented by the fetal heart monitor strip. Conversely, during Defendants' case, an obstetrician/gynecologist, Dr. VanDorsten, testified that Dr. Finke was not negligent in failing to perform a C-section. Dr. Finke likewise offered her own testimony that she was not negligent. A pediatric neuroradioligist, Dr. Vezina, reviewed Madeline's MRI and CT scans and testified that Madeline did not have PVL, just immature myleniation, which subsequently resolved to a remaining, small, "non-specific" white spot. He also testified that this white spot would cause no neurological problems for Madeline. And, finally, all experts agreed that tests ruled out genetic metabolic abnormality, meningitis, and encephalitis as potential causes of Madeline's symptoms and that all cultures performed at the hospital for all infections were negative. Thus, here, the jury was presented with strong expert testimony on both sides of the negligence and cause-in-fact issues.

 Medical malpractice cases often present "a battle of the experts." *Cruz,* 44 S.W.3d at 646 (citing *Magee v. Ulery,* 993 S.W.2d 332, 336 (Tex.App.-Houston [14th Dist.] 1999, no pet.)). In a battle of competing experts, it is the sole obligation of the jury to determine the credibility of the witnesses and to weigh their testimony. *See Welch v. McLean,* No. 2–02–00237–CV, —— S.W.3d ——, ——, 2005 WL 1293068, at *7 (Tex.App.-Fort Worth June 2, 2005, no pet. h.) (not yet reported); *Warner v. Hurt,* 834 S.W.2d 404, 408–09 (Tex.App.-Houston [14th Dist.] 1992, no writ). It is particularly within the jury's province to weigh opinion evidence and the judgment of experts. *Cruz,* 44 S.W.3d at 647 (citing *Pilkington v. Kornell,* 822 S.W.2d 223, 230 (Tex.App.-Dallas 1991, writ denied)). The jury decides which expert witness to credit. *Id.*

When we review evidence, we are not free to reweigh the evidence and set aside a jury verdict merely because we feel a different result is more reasonable. *Pool v. Ford Motor Co.,* 715 S.W.2d 629, 634 (Tex.1986) (op. on reh'g). We may not merely substitute our opinion for that of the trier of fact and determine that we would reach a different conclusion. *Cruz,* 44 S.W.3d at 647; *Merckling v. Curtis,* 911 S.W.2d 759, 763 (Tex.App.-Houston [1st Dist.] 1995, writ denied). We cannot sit as a thirteenth juror, and we cannot under any circumstances retry the case. *See Warner,* 834 S.W.2d at 408–09.

Here, the jury was free to believe Plaintiffs' experts, Drs. Ater, Rice, and Jones, instead of the defense experts. The jury was free to believe Plaintiffs' theory of the case instead of the defensive theory of the case. *See, e.g., id.* Plaintiffs' negligence and cause-in-fact evidence concerning Dr. Finke is not so weak, nor Defendants' controverting evidence so overwhelming that the jury's findings should be set aside and a new trial ordered. *See Mar. Overseas Corp.,* 971 S.W.2d at 406–07; *Garza,* 395 S.W.2d at 823.

We overrule the first and second issues of Dr. Finke and the clinic.

### 4. The Nurses—Cause–in–Fact[27]

██ The nurses contend that legally insufficient evidence exists, under *Lenger,* of the cause-in-fact element of proximate

---

**27.** The hospital joins in this issue presented by the nurses. Because the hospital's liability under this issue is contingent upon the nurses' liability, for simplicity we will refer only to the nurses in our discussion of the sufficiency of the evidence to support the cause-in-fact element of the jury's negligence findings against the nurses.

cause to support the jury's negligence finding against them. Again, we do not detail all of the evidence of the nurses' alleged breaches of the standard of care because the nurses do not challenge this aspect of the jury's negligence findings against them. We do briefly summarize some of this evidence, however, because it forms the basis for the jury's cause-in-fact finding.

Nurse Walker testified that when Dr. Finke was out of the room, "I am responsible for that strip. I'm responsible to know how that baby is responding to labor." Rose Fenton, the charge nurse during Madeline's delivery, testified that hospital policies required Nurse Walker to classify Madeline's strip as reassuring or nonreassuring, to assess fetal distress, and to assess the need for a C-section. Nurse Walker testified that she is to comply with the hospital's policies and with the standard of care in discharging her nursing duties. Nurse Walker testified that if circumstances dictated, she could set things in motion for a delivery by C-section. Nurse LaMont testified, frame by frame, about Madeline's fetal heart monitor strip. She testified that it was nonreassuring from 5:10 p.m. on and documented fetal distress requiring immediate action by 7:00 p.m. Nurse LaMont explained that the patterns documented on Madeline's strip indicate a lack of oxygenation and said that it was the nurses responsibility to monitor and ensure adequate fetal oxygenation. Finally, Nurse LaMont testified that the nurses breached the nursing standard of care in numerous respects, by failing to accurately assess the fetal heart monitor strip; failing to accurately intervene based on the problems documented on the strip, including failing to notify Dr. Finke of the significant decel at 7:15 p.m.; failing to provide timely care to Donna, including failing to prepare Donna for a C-section; failing to access the chain of command to get timely care for Madeline and Donna, specifically failing to page or call for another physician when Dr. Finke was not available; and failing to properly resuscitate Madeline after birth.[28]

During his three days of trial testimony, Dr. Ater used slides to explain to the jury the physical impact of the continuing, worsening, hypoxic ischemic insults documented on Madeline's fetal heart monitor strip. Dr. Ater explained that although Madeline's permanent brain injuries actually occurred during the forceps delivery, she had been "set up" for the injuries by her course of care throughout the day, specifically her continued lack of adequate oxygenation from about 5:10 p.m. through her birth.

The nurses argue that their negligence could not be a cause-in-fact of any injury to Madeline because all of Madeline's injuries occurred during the vaginal forceps delivery and the decision to perform a vaginal forceps delivery instead of a C-section was a medical decision that only Dr. Finke could make. Thus, the nurses

---

28. The jury could have based its negligence findings concerning the nurses on any of these unchallenged breaches of the standard of care. See, e.g., Dillard v. Tex. Elec. Co-op., 157 S.W.3d 429, 434 (Tex.2005) (recognizing that in broad form negligence question "jurors need not agree on every detail of what occurred so long as they agree on the legally relevant result"). But because the record supports the jury's findings that each of the following unchallenged breaches of the standard of care—failure to accurately assess the fetal heart monitor strip, failure to accurately intervene based on the problems documented on the strip, and the failure to provide timely care to Donna, including the failure to prepare Donna for a C-section—were a cause-in-fact of Madeline's brain injury, we do not address the sufficiency of the evidence concerning the remaining unchallenged breaches of the standard of care.

essentially argue that Dr. Finke's conduct and medical decisions were *a new and independent cause* of Madeline's injury. *See, e.g., Dillard,* 157 S.W.3d at 432 & n. 3 (recognizing "new and independent cause means the act or omission of a separate and independent agency, not reasonably foreseeable, that destroys the causal connection, if any, between the act or omission inquired about and the occurrence in question and thereby becomes the immediate cause of the occurrence"). But a new and independent cause instruction was submitted to the jury; the jury rejected it and nonetheless found that the nurses' negligence was a proximate cause of Madeline's injuries.

■ More than one proximate cause, including more than one cause-in-fact, may exist. *Lee Lewis Constr., Inc. v. Harrison,* 70 S.W.3d 778, 784 (Tex.2001) ("More than one act may be the proximate cause of the same injury."); *see also Hall v. Huff,* 957 S.W.2d 90, 96–98 (Tex.App.-Texarkana 1997, pet. denied) (reversing causation summary judgment for first doctor where second doctor perforated patient's heart); *Harvey v. Stanley,* 803 S.W.2d 721, 725–26 (Tex.App.-Fort Worth 1990, writ denied) (holding first doctor liable for failure to diagnose heart condition where patient died during subsequent stress test conducted under supervision of second doctor). There can be concurrent proximate causes; all persons whose negligent conduct contributes to the injury, proximately causing it are liable. *Travis v. City of Mesquite,* 830 S.W.2d 94, 98 (Tex.1992) (op. on reh'g). The ultimate standard of proof on cause-in-fact is whether by a preponderance of the evidence, the negligent act or omission is shown to be *a substantial factor* in bringing about an injury, without which the harm would not have occurred. *Park*

*Place Hosp.,* 909 S.W.2d at 511; *Doe,* 907 S.W.2d at 477.

■ Considering the evidence and inferences that a reasonable juror could credit and that tend to support the jury's cause-in-fact findings concerning the nurses breaches of the standard of care—failure to accurately assess the fetal heart monitor strip to recognize Madeline's increasing stress and inadequate oxygenation, failure to accurately intervene based on the problems documented on the strip to ensure Madeline's adequate oxygenation, and the failure to provide timely care to Donna to ensure Madeline's oxygenation, including the failure to prepare Donna for a C-section—and disregarding all evidence and inferences to the contrary because a reasonable juror could, the evidence is legally sufficient to permit the jury to conclude that the nurses' breaches of the standard of care were a substantial factor in bringing about Madeline's brain injury and without which Madeline's brain injury would not have occurred. Dr. Ater explained that Madeline had been "set up" for the injuries she suffered during the forceps delivery by her lack of adequate oxygenation from about 5:10 p.m. through her birth. Dr. Ater testified that "in a normal patient who has forceps, you don't have this serious problem[,]" but "in this patient where there was already a hypoxic-ischemic pre-existing insult, by adding this additional mechanical traumatic insult, I think that the consequence to the brain was … PVL." Dr. Ater explained, "I **don't think one—the forceps alone would have done it** [caused Madeline's PVL]. I think that the forceps was a straw that broke the camel's back." In other words, the evidence shows that if Madeline had been adequately oxygenated throughout the day prior to the vaginal forceps delivery, that delivery alone would not have caused her brain injury; she

would have had sufficient fetal reserves to sustain her through it. Thus, evidence exists that the nurses' unchallenged standard of care breaches—failure to accurately assess the fetal heart monitor strip to recognize Madeline's increasing stress and inadequate oxygenation, failure to accurately intervene based on the problems documented on the strip to ensure Madeline's adequate oxygenation, and the failure to provide timely care to Donna to ensure Madeline's oxygenation, including the failure to prepare Donna for a C-section—constituted a *substantial factor* in bringing about Madeline's brain injury and without which Madeline's brain injury would not have occurred; Dr. Ater specifically testified that the forceps delivery alone would not have caused Madeline's injury if she had been adequately oxygenated. Thus, more than a scintilla of evidence exists under the third *Lenger* prong—a probable causal relationship shown by expert testimony—that the nurses' unchallenged standard of care breaches as testified to by Nurse LaMont were a cause-in-fact of Madeline's injury.[29] *Lenger*, 455 S.W.2d at 706; *accord Lee Lewis*, 70 S.W.3d at 784 (holding more than a scintilla of evidence existed that defendant's failure to require workers to use independent lifelines was substantial factor in causing plaintiff's death); *see also Long v. Mo. Delta Med. Ctr.*, 33 S.W.3d 629, 637–38 (Mo.Ct.App.2000) (holding evidence similar to present evidence was sufficient to support jury's "but/for" causation finding against labor and delivery nurse despite contention that her "liability . . . ends when the physician assumes control of his patient").

29. The dissent concludes that the jury could consider Dr. Ater's causation testimony only in conjunction with Dr. Finke's negligence, not in conjunction with the nurses' negligence. But a medical doctor may testify concerning causation from a breach of the nursing standard of care. *Accord Columbia Med. Ctr. of Las Colinas v. Bush ex rel. Bush*, 122 S.W.3d 835, 851 (Tex.App.-Fort Worth 2003, pet. denied) (recognizing doctor testified for defense on nursing and paramedic standards of care).

Ironically, here, the nurses' trial counsel objected to the causation testimony of Plaintiffs' nursing expert, Nurse LaMont; he argued that only a medical doctor, like Dr. Ater, should be permitted to testify concerning causation. The trial court sustained this objection and excluded Nurse LaMont's causation testimony. Because the nurses objected to causation testimony from a nurse, arguing that only a physician could provide causation testimony, they cannot now argue that Plaintiffs' evidence is insufficient because causation testimony from a nurse was required. *See, e.g., Gen. Chem. Corp. v. De La Lastra*, 852 S.W.2d 916, 920 (Tex.) (parties may not invite error by requesting trial court action and then complaining that very action is erroneous), *cert. dism'd*, 510 U.S. 985, 114 S.Ct. 490, 126 L.Ed.2d 440 (1993). The dissent's analysis would allow the nurses to do just that.

Finally, the dissent asserts that we are addressing a theory of causation as to the nurses that is not advanced by the Morrells on appeal. The jury's findings of standard of care breaches by the nurses are unchallenged. Unchallenged fact findings are binding on this court. *See, e.g., Bedford v. Moore*, 166 S.W.3d 454, 466 (Tex.App.-Fort Worth 2005, no pet.) (Cayce, C.J., concurring) (stating that an unchallenged jury finding is binding on appellants); *Hotel Partners v. KPMG Peat Marwick*, 847 S.W.2d 630, 632 (Tex.App.-Dallas 1993, writ denied) (same); *see also McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696 (Tex.1986) (unchallenged finding of fact is binding on appellants). And the jury could have based its cause-in-fact finding on any of the unchallenged standard of care breaches testified to by Nurse LaMont. Yet the dissent would hold that these unchallenged standard of care breaches will not support a cause-in-fact finding because the Morrells (as Appellees) purportedly failed to brief them. The Morrells do not bear the burden on appeal of establishing the sufficiency of the evidence; the nurses bear the burden of showing the insufficiency of the evidence. The cases cited by the dissent do not hold otherwise.

Additionally, the evidence establishes that the nurses negligence was a cause-in-fact of Madeline's injuries under the second *Lenger* prong—expert testimony providing scientific principles allowing the fact finder to establish a traceable chain of causation from the condition back to the event. *See Lenger,* 455 S.W.2d at 706; *Marvelli,* 100 S.W.3d at 470. Madeline's current condition is caused by her PVL, according to pediatric neuroradiologist Dr. Jones. Madeline's PVL was caused by lack of adequate oxygenation during the forceps delivery, according to pediatric neurologist Dr. Ater. Madeline's lack of adequate oxygenation during the forceps delivery occurred, according to Dr. Ater, because she had been experiencing repeated, increasingly severe, hypoxic ischemic insults for hours, throughout Donna's labor. According to Nurse LaMont, the standard of care required the nurses to accurately assess the fetal heart monitor strip and to ensure that Madeline was adequately oxygenated; they were negligent by failing to intervene based on the oxygenation problems documented on the strip. Thus, a traceable chain of causation, provided by expert testimony, exists connecting the nurses' unchallenged standard of care breaches to Madeline's brain injury.[30]

In support of their contention that no cause-in-fact evidence exists in this case, the nurses cite *Roark v. Allen,* 633 S.W.2d 804 (Tex.1982), *Duff v. Yelin,* 751 S.W.2d 175 (Tex.1988), and *Arlington Memorial Hospital Foundation, Inc. v. Baird,* 991 S.W.2d 918 (Tex.App.-Fort Worth 1999, pet. denied). In *Roark,* an expert testified that the child's skull was fractured as a result of the forceps slipping, but no ex-

pert testified that the "alleged improper application of the forceps caused them to slip." 633 S.W.2d at 811. In *Duff,* the plaintiff did not have an expert, but relied instead upon the defendant doctors' testimony. 751 S.W.2d at 176. The defendant doctors would not and did not testify that either of the two possible causes propounded by the plaintiff for his ulnar nerve injury caused the injury within a reasonable medical probability. *Id.* In *Baird,* no expert testified that a reused phaco tip caused Baird's eye burn. 991 S.W.2d at 923. In the present case, unlike in *Roark, Duff,* and *Baird,* independent, direct expert testimony based on reasonable medical probability exists concerning causation. Dr. Ater testified that in reasonable medical probability Madeline's continued, worsening hypoxic ischemic insults—which Nurse LaMont testified were documented on the fetal heart monitor strip and negligently misread and not acted upon by the nurses—"set up" Madeline for PVL. According to expert testimony by Dr. Ater, if Madeline had not been "set up," the forceps delivery alone would not have caused her PVL. Thus, the expert testimony present in the record before us distinguishes this case from *Roark, Duff,* and *Baird.*

Applying the factual sufficiency standard of review to the evidence, the evidence supporting the jury's finding that the nurses' negligence was a proximate cause, including a cause-in-fact, of Madeline's injuries is not so weak nor is the evidence to the contrary so overwhelming that the answer should be set aside and a new trial ordered. *See Mar. Overseas Corp.,* 971 S.W.2d at 406–07; *Garza,* 395 S.W.2d at 823. We overrule the nurses' and hospital's first issue.[31]

---

30. The dissent apparently would require evidence that the nurses' standard of care breaches were the cause-in-fact of Madeline's hypoxic ischemic insults.

31. We have thoroughly—in the previous sixty-four pages of this slip opinion—detailed the evidence contained in the forty-three volumes of reporter's record from this five week jury

## B. Past and Future Medical Expenses

Dr. Finke and the clinic, in their third and fourth issues, and the hospital and the nurses in their second issue, complain that the jury's award of $160,000 for Madeline's past medical expenses and of $3,500,000 for Madeline's future medical expenses is supported by factually insufficient evidence. They also argue that the jury's award of $160,000 for past medical expenses is excessive because they contend that Madeline sustained some degree of injury not caused by Dr. Finke's or the nurses' negligence and that the Morrells failed to segregate damages caused by Dr. Finke or the nurses from damages that they did not cause. And, they claim that the jury's award of future medical expenses is excessive because Plaintiffs' expert on future-medical-expenses damages failed to reduce her damages testimony to present value. Alternatively, they ask this court to order a remittitur concerning both of these elements of damages.

### 1. Segregation

■ Defendants contend that Plaintiffs were required to segregate past and future medical expenses damages that the nurses allegedly caused from the damages Dr. Finke allegedly caused. Defendants argue that Plaintiffs were required to segregate damage Madeline suffered from hypoxic ischemic insults prior to 7:27 p.m. from the damage she suffered based on Dr. Finke's alleged breaches of the standard of care from 7:27 p.m. onward.[32] In support of this contention, they cite *Texarkana Me-morial Hospital v. Murdock*, 946 S.W.2d at 838.

The *Murdock* case, however, involved a baby born with congenital defects; the supreme court held that the defendants could not be held responsible for past medical expenses associated with the baby's congenital defects. *Id.* at 840. The supreme court explained that a plaintiff may recover only for medical expenses specifically shown to result from treatment made necessary by the negligent acts or omissions of the defendant, where such a differentiation is possible. *Id.; see also Hilland v. Arnold*, 856 S.W.2d 240, 242 (Tex.App.-Texarkana 1993, no writ) (recognizing plaintiff should not recover for medical expenses for treatment of preexisting condition); *Kulms v. Jenkins*, 557 S.W.2d 149, 154 (Tex.Civ.App.-Amarillo 1977, writ ref'd n.r.e.) (same).

Here, Defendants do not contend that Madeline's medical expenses were incurred for treatment of a congenital defect. Likewise, Defendants do not contend that Madeline incurred medical expenses for treatment of some condition existing prior to Defendants' alleged negligence during Donna's labor and the delivery of Madeline. Instead, here, the jury was free to believe the expert testimony that the nurses' negligence in misreading the strip and failing to take action based on the strip permitted Madeline to suffer increasingly severe inadequate oxygenation so that she was "set up" for PVL and that Dr. Finke's negligence in performing a

---

trial involving sixteen expert witnesses. Consequently, we are flabbergasted by the dissent's contention that setting forth facts and testimony reflected in this record—replete with numerous quotes—somehow constitutes a "re-invention" of the case tried to the jury. Nor do we understand the dissent's criticism of our opinion for applying the proper, deferential standard of review.

32. Specifically, Defendants claim that remand is required "[b]ecause the Morrells adduced no evidence that would enable a lay jury to distinguish Madeline's probable future medical expenses caused by Dr. Finke's alleged negligence from those that she would have incurred anyway because of the prior hypoxic events."

vaginal forceps delivery instead of a C-section caused the already-oxygen-deprived Madeline irreparable brain damage. Thus, we hold that the *Murdock* segregation rule—requiring segregation of medical expenses incurred for treatment made necessary by the negligence of the defendant from medical expenses incurred for treatment of other conditions that were not made necessary by the negligence of the defendant—is inapplicable here; evidence existed that all of Madeline's past medical expenses were incurred for treatment made necessary by her hypoxic ischemic encephalopathy that experts testified, and the jury found, resulted from Defendants' negligence.

### 2. Past Medical Expenses

██ Defendants claim that the jury's award of $160,000 in past medical expenses is excessive.[33] The jury was asked in special question number 4, "[w]hat sum of money, if any, if paid now in cash, would fairly and reasonably compensate ROBERT MORRELL and DONNA MORRELL for their loss resulting from the injuries of MADELINE MORRELL." Item A under this question instructed the jury to consider,

> The reasonable and necessary expenses for hospital care, rehabilitative care, medical care, physical therapy, occupational therapy, speech therapy, attendant/custodial care, medicine, and durable goods in the past.

The jury wrote $160,000 in the blank following this element of damages.

Plaintiffs' exhibit 18 documented $69,577.98 in medical expenses for Madeline; medical records affidavits support this amount. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 18.001 (Vernon 1997). Additionally, Madeline received physical therapy, speech therapy, and occupational therapy each once a week for years, through the summer of 2000. Donna testified that therapies cost "over $250" per week. Dr. Ater testified that these therapies were necessitated by Madeline's hypoxic ischemic encephalopathy. Six years of weekly physical therapy, speech therapy, and occupational therapy at "over $250" per week would cost over $78,000.

Dr. Cheryl Silver, a neuropsychologist, testified that she has examined Madeline twice. She specializes in treatment planning and teaches graduate students "how to do appropriate and accurate testing for the purpose of diagnosis and for the purpose of treatment planning" for mentally retarded children.[34] Dr. Silver performed diagnostic testing on Madeline and testified that Madeline

> needs occupational therapy because of her motor problems, because of her motor, fine motor and visual motor problems, that she needs physical therapy because of her gross motor problems and balance problems, that she needs language therapy or its sometimes called speech therapy for her language problems, that it seems that she requires therapy or consultation from a person who specializes in parenting skills or behavior management.

Dr. Silver testified that Madeline would not have these impairments "if her brain weren't damaged in some way."

This evidence sufficiently supports the Morrells' claim for Madeline's past medical expenses by establishing that the expenses

---

**33.** The standard of review for an excessive damages complaint is factual sufficiency of the evidence. *See Mar. Overseas Corp.*, 971 S.W.2d at 406.

**34.** "Treatment planning," according to Dr. Silver, means making recommendations, based on test results, of the types of therapies needed.

were reasonable[35] and were necessary for Madeline to incur as a result of her brain injury. Moreover, unless the record demonstrates otherwise, we must presume that the jury followed the instruction in the court's charge to only compensate the Morrells for reasonable and necessary expenses they incurred for the injuries to Madeline. *See Tesfa v. Stewart*, 135 S.W.3d 272, 278–79 (Tex.App.-Fort Worth 2004, pet. denied); *see also Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 771 (Tex.2003); *Turner, Collie & Braden, Inc. v. Brookhollow, Inc.*, 642 S.W.2d 160, 167 (Tex.1982). The record does not indicate that the jury disregarded this instruction and awarded unreasonable or unnecessary past medical expenses.

The jury's award of $160,000 in past medical expenses is supported by the evidence and is not so against the great weight and preponderance of the evidence as to be manifestly unjust. We hold that the evidence supporting the jury's award of past medical expenses is factually sufficient; we are not at liberty to order a remittitur. *Larson v. Cactus Util. Co.*, 730 S.W.2d 640, 641 (Tex.1987); *Wal–Mart Stores, Inc. v. Odem*, 929 S.W.2d 513, 528 (Tex.App.-San Antonio 1996, writ denied) (op. on reh'g). We overrule Dr. Finke and the clinic's fourth issue.

### 3. Future Medical Expenses

■ Defendants claim that the jury's award of future medical expenses is excessive because Plaintiffs' expert on future-medical-expenses damages failed to reduce her damages testimony to present value. Alternatively, they seek a remittitur. The jury was instructed in special question number 3 to determine "[w]hat sum of money, if paid now in cash, would fairly and reasonably compensate MADELINE

MORRELL for her injures, if any, resulting from the negligence you have found in answer to Question No. 1 of this charge." Item B set forth under special question 3 instructed the jury to consider,

The reasonable and necessary expenses for attendant care/custodial care, nursing care, medicine, institutional care, physical therapy, occupational therapy, speech therapy, durable medical goods, and transportation that, in reasonable probability Madeline Morrell will sustain in the future after she reaches the age of eighteen (18) years.

Virgina Stegent, Plaintiffs' life-care planner, testified that Madeline's future medical expenses would require between $4.2 million and $5.4 million "in today's dollars." Defendants' expert testified that the present value of Madeline's future medical expenses was $1.49 million. The jury found the present value of Madeline's future medical expenses to be $3.5 million, an amount that basically split the difference between Defendants' $1.5 million calculation and Plaintiffs' $5.4 million calculation.

■ Ms. Stegent's testimony, provided in terms of "today's dollars," does constitute a reduction to present value. *See, e.g., In re Hailey*, 792 N.E.2d 851, 861 n. 9 (Ind.2003) (defining present value as the total sum of future payments based upon the plaintiff's projected life expectancy discounted to reduce the sum to its value in "today's dollars"); *Nguyen v. Los Angeles County Harbor/UCLA Med. Ctr.*, 40 Cal. App.4th 1433, 48 Cal.Rptr.2d 301, 309–10 (1995) (same). Because the record contains evidence indicating that Madeline would require between $4.2 and $5.4 million in future medical expenses in "today's dollars," we overrule Defendants' conten-

---

**35.** The record reflects that Madeline received her therapy at the hospital; the hospital is not contending that the amount it billed the Morrells was not reasonable.

tion that the Morrells' life-care planner failed to reduce the cost of Madeline's medical care to present value. We likewise decline to order a remittitur because the evidence that Madeline will require between $4.2 and $5.4 million in future medical expense is factually sufficient to support the jury's award of $3.5 million in future medical expenses. *See, e.g., Wal–Mart,* 929 S.W.2d at 528 (explaining that appellate court cannot order remittitur when damage evidence is factually sufficient).

We overrule Dr. Finke and the clinic's third issue and the nurses and the hospital's second issue.

### C. NURSE FENTON'S JOINT AND SEVERAL LIABILITY

■ In their third issue, the nurses contend that the trial court's judgment erroneously imposes joint and several liability on Nurse Rose Fenton even though the jury found her to be only five percent proportionately responsible for causing Madeline's injuries.[36] The proportionate responsibility statute does not permit the imposition of joint and several liability upon a party found to be five percent liable. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 33.013 (Vernon 2004).[37] We sustain the nurses' third issue.

### D. DONNA AND ROBERT MORRELL'S CLAIM, INDIVIDUALLY, AGAINST THE NURSES FOR PAST MEDICAL EXPENSES

■ In their fourth issue, the nurses argue that Donna and Robert's claim, individually, against them for Madeline's medical expenses is barred by the statute of limitations. The nurses pleaded the affirmative defense of limitations and moved

for JNOV on the ground that limitations barred this claim, thus preserving the issue for our review. *See* TEX.R.APP. P. 33.1; *CDB Software, Inc. v. Kroll,* 992 S.W.2d 31, 35 (Tex.App.-Houston [1st Dist.] 1998, pet. denied).

### 1. Standard of Review

■ A JNOV is proper when a directed verdict would have been proper. *See* TEX.R. CIV. P. 301; *Fort Bend County Drainage Dist. v. Sbrusch,* 818 S.W.2d 392, 394 (Tex.1991); *CDB Software, Inc.,* 992 S.W.2d at 35. A motion for JNOV should be granted when the evidence is conclusive and one party is entitled to recover as a matter of law or when a legal principle precludes recovery. *Mancorp, Inc. v. Culpepper,* 802 S.W.2d 226, 227 (Tex.1990).

### 2. Limitations

### a. Parents possess claim for child's medical expenses

■ Texas courts have long recognized that a minor has a well-defined common law cause of action to sue for injuries negligently inflicted by others. *Sax v. Votteler,* 648 S.W.2d 661, 666 (Tex.1983) (citing *Tex. & P. Ry. Co. v. Morin,* 66 Tex. 225, 18 S.W. 503 (1886); *Houston & Great N. R. Co. v. Miller,* 51 Tex. 270 (1879); and *Fall v. Weber,* 47 S.W.2d 365 (Tex.Civ. App.-Dallas 1932, writ ref'd)). A child's cause of action, however, is distinctly separate from the parent's right to recover damages for injuries to his children. *Sax,* 648 S.W.2d at 666. A child may recover damages for pain and suffering as well as for other damages she may accrue after she reaches the age of majority. *Id.* Parents, however, possess a cause of action to

---

**36.** The Morrells concede this issue.

**37.** Neither the pre–1995 version of the statute nor the post–1995 version of the statute authorize joint and several liability against a five

percent liable tortfeasor. Consequently, for purposes of this issue, we do not differentiate between these two versions of the statute.

recover medical expenses incurred by their minor children through the date the child attains majority and for the loss of services and earnings of an unemancipated minor. *Id.; Kennedy v. Mo. Pac. R. Co.,* 778 S.W.2d 552, 555 (Tex.App.-Beaumont 1989, writ denied); *Kennedy v. Kennedy,* 505 S.W.2d 393, 397 (Tex.Civ.App.-Austin 1974, no writ); *Bering Mfg. Co. v. Peterson,* 28 Tex.Civ.App. 194, 67 S.W. 133, 135 (Tex.Civ.App.1902, writ dism'd) ("Historically, in Texas, the right to recover for medical costs incurred in behalf of the minor is a cause of action belonging to the parents, unless such costs are a liability as to the minor's estate.").

### b. Limitations on parent's claim

The statute of limitations governing health care liability claims is two years, except that minors under the age of twelve have until their fourteenth birthday to file a health care liability claim or to have one filed on their behalf. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.251 (Vernon 2004). The Morrells' claim for Madeline's medical expenses until she reaches the age of eighteen belongs to them individually; it does not belong to Madeline, and they are not bringing this claim on her behalf. *See Sax,* 648 S.W.2d at 666; *Kennedy,* 778 S.W.2d at 555; *Kennedy,* 505 S.W.2d at 397; *Bering Mfg. Co.,* 67 S.W. at 135. Consequently, the Morrells had two years from "the occurrence of the breach or tort or from the date the medical or health care treatment that is the subject of the claim or the hospitalization for which the claim is made is completed" to file suit. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.251. Madeline was delivered on December 31, 1994; the Morrells sued Dr. Finke, the clinic, and the hospital on August 28, 1996.

On March 30, 1999, they added as defendants Nurses Fenton, Stephens, and Walker. Accordingly, because the Morrells did not assert their claims for Madeline's medical expenses against Nurses Fenton, Stephens, and Walker until after limitations had run, the trial court erred by denying the nurses' motion for JNOV on the ground that the Morrells' claims against them were barred by the statute of limitations. We sustain the nurses' fourth issue.[38]

### VI. CONCLUSION

Having sustained the nurses' third issue challenging the imposition of joint and several liability upon Rose Fenton, R.N.C., we modify the judgment by deleting the provisions imposing joint liability on Nurse Fenton so that her liability is several only, for five percent of the damages awarded in the judgment. *See* TEX.R.APP. P. 43.2(b). Having sustained the nurses' fourth issue claiming that the Morrells' claim against them for Madeline's past medical expenses is barred by the statute of limitations, we reverse that portion of the trial court's judgment imposing liability upon the nurses individually for Madeline's past medical expenses. We render judgment that the Morrells take nothing from the nurses individually on their claim for Madeline's past medical expenses. Having overruled the balance of Defendants' issues and the Morrells' issues challenging the JNOV, we affirm the trial court's judgment in all other respects.

GARDNER, J. filed a dissenting opinion in which CAYCE, C.J. joins.

HOLMAN and McCOY, JJ. recused.

---

**38.** The hospital was timely sued and remains jointly and severally liable as set forth in the judgment for this element of damages.

ANNE GARDNER, Justice, dissenting opinion.

I respectfully dissent because there is no evidence that any breach of the standard of care either by the nurses or by Dr. Finke was a cause-in-fact of Madeline's injuries.

## DR. FINKE

The majority opinion fails to bridge the "fatal gap" in the evidence of cause-in-fact. Dr. Ater's opinions on causation were never linked to any breach of the standard of care by Dr. Finke as testified to by Dr. Rice. The opinion of Dr. Rice was that Dr. Finke was negligent in failing to decide on a C-section by 7:27 p.m. with delivery by 7:35 p.m. But Dr. Ater testified that all of Madeline's injuries occurred during the ten or fifteen-minute period of the forceps delivery and were proximately caused by the trauma of the forceps delivery, combined with cumulative hypoxic-ischemic insults that had been occurring throughout the afternoon.[1]

Despite the majority's efforts to interweave the opinions of Plaintiffs' experts on standard of care and causation into a consistent theory, those experts were "ships that passed in the night"[2] that never spoke in passing. it is not our role as a reviewing court to "borrow from each expert pieces of opinion that seem to match, tie them together in an ill-fitting theory ... and then argue that this is some evidence to support the verdict." *Gen. Motors Corp. v. Iracheta*, 161 S.W.3d 462, 472 (Tex.2005). I believe the majority has done just that.

Neither Dr. Rice nor Dr. Ater testified that, if Dr. Finke had delivered Madeline by C-section in the time frame of 7:27 p.m. to 7:35 p.m., all or even some of Madeline's injuries would have been prevented. Dr. Ater only said that he believed Madeline "would have done a lot better if they could have delivered her by a C-section right then." That opinion does not tell us whether a C-section would have avoided all or some or any of Madeline's injuries. Dr. Ater's speculative and conclusory opinion is not competent evidence that Dr. Finke's negligence was a substantial factor without which Madeline would not have suffered the neurological injuries and damages that she ultimately sustained. *Park Place Hosp. v. Estate of Milo*, 909 S.W.2d 508, 511 (Tex.1995) (holding medical testimony failing to establish more than fifty percent chance of recovery but for negligence not legally sufficient to establish causation); *Bradley v. Rogers*, 879 S.W.2d 947, 955–56 (Tex.App.-Houston [14th Dist.] 1994, writ denied) (characterizing opinion that a patient presenting as claimants did generally will be "be better off" if surgery is not delayed as speculation and no evidence of proximate cause).

The majority also incorrectly characterizes Dr. Rice's opinion testimony. According to the majority, Dr. Rice opined that "from 7:27 onward, Madeline was so 'stressed' that the standard of care from that point forward 'absolutely' required a C-section to avoid further stressing her through a vaginal delivery." This is not what he said. Instead, he agreed only generally that stress related to a problem with the umbilical cord is a reason for a physician to avoid a forceps delivery and

---

1. Dr. Ater testified on causation before Dr. Rice testified on the standard of care as to Dr. Finke. Neither expert heard the testimony of the other. Dr. Ater admitted that he was not even aware of Dr. Rice's opinion that it was Dr. Finke's failure to perform a C-section by 7:27 p.m. that breached the medical standard of care until that was pointed out to him on cross-examination.

2. From "The Theologian's Tale," by Henry Wadsworth Longfellow.

that a forceps delivery would not have been appropriate at 7:27 p.m., while Madeline was at "zero" station. Dr. Rice explained that there "would be a very high chance *at this high station*" that Madeline would not be able to tolerate "this difficult of a forceps delivery." [Emphasis added.] He never addressed whether the forceps delivery was appropriate at the plus two station, where Dr. Finke testified the baby's head had descended when she proceeded with the forceps delivery at 7:50 p.m.

The experts agreed that the cause of variable and late decels such as those noted on the fetal monitor strip was compression of the umbilical cord, indicating reduction in the supply of oxygen to the baby or "hypoxia." Additionally, it was undisputed that the forceps delivery was "traumatic," with the baby in the difficult OP (face-up) position and the sudden development of the life-threatening condition of shoulder dystocia. None of those conditions was attributed by any expert to any negligence of any of the defendants. And while Dr. Ater testified that all of Madeline's injuries occurred during the "traumatic forceps delivery," he did not say nor did any other expert testify that Madeline's injuries were caused by a breach of the standard of care in the forceps delivery.

To summarize, while there is evidence that Dr. Finke deviated from the applicable standard of care in failing to perform a timely C-section by 7:27 p.m., there is no evidence that her failure to perform a timely C-section was a cause-in-fact of Madeline's injuries. The only competent expert testimony establishing the cause of Madeline's injuries is the opinion of Dr. Ater that they were caused during the forceps delivery. Yet, no expert testified that Dr. Finke breached the standard of care for performing a forceps delivery.

Consequently, there is no evidence supporting the essential "link" in the causal chain between any conduct of Dr. Finke for which there is evidence of negligence and the injuries suffered by Madeline. *See, e.g., Roark v. Allen,* 633 S.W.2d 804, 811 (Tex.1982) (holding that, although there was evidence of breach of the standard of care by defendant physician in delivering the baby by forceps, there was no evidence of proximate cause where plaintiffs' expert testified only that baby's skull was fractured "as a result of the forceps slipping" but no expert testified that improper application of the forceps caused them to slip, so that a jury could not infer, from that evidence alone, the cause of the forceps slipping); *see also Arlington Mem'l Hosp. Found., Inc. v. Baird,* 991 S.W.2d 918, 922–23 (Tex.App.-Fort Worth 1999, pet. denied) (reversing judgment against hospital based on negligence in allowing reuse of "phaco tip" absent expert testimony that negligence in allowing such reuse was cause of corneal burn); *Duff v. Yelin,* 751 S.W.2d 175, 177 (Tex.1988) (holding evidence patient suffered nerve injury insufficient absent proof injury caused by improper positioning during surgery). Therefore, I would hold that there is no evidence of cause-in-fact as to Dr. Finke.

## THE NURSES

Contrary to the majority's conclusion that there was "direct" medical testimony of causation as to the nurses' negligence, the trial court sustained defense objections to testimony on causation from Nurse LaMont, the only expert Plaintiffs offered on causation as to negligence of the nurses. While I agree with the majority that Dr. Ater *could* have testified regarding cause-in-fact as to the nurses' negligence, the fact is that he did not. The only expert testimony was to the contrary, from Dr. VanDorsten and Dr. Finke—that the nurs-

es' conduct was *not* a proximate cause of Madeline's injuries.

The majority opinion combines Nurse LaMont's testimony regarding numerous breaches of the nursing standard of care with Dr. Ater's testimony that continued, worsening hypoxic-ischemic insults throughout the day "set up" Madeline for PVL. But there was no expert opinion connecting the continued, worsening hypoxic-ischemic insults to any breaches of the nurses' standard of care.

The majority's holding that the jury could find causation from the nurses' negligence absent expert opinion or a traceable chain of causation is necessarily a holding that the lay jury could infer the essential causal link on the basis of general experience and common sense. *See Lenger. v. Physician's Gen. Hosp., Inc.*, 455 S.W.2d 703, 708 (Tex.1970) (limiting instances where lay inference may properly be allowed to determine causation). I disagree that this is such a case where the causal link may be established absent direct expert opinion or guiding scientific principles established by expert testimony. The only testimony of the experts was contrary to any such inference.

Plaintiffs have not even argued the theory advanced by the majority.[3] Their argument on appeal is that the nurses caused Madeline's injuries, not by allowing hypoxia to develop during labor so as to cause Madeline to be "set up," but by *failing to prevent the forceps delivery.* Plaintiffs contend that the nurses should have notified Dr. Finke of the 7:15 p.m. decel under the theory that Dr. Finke would then have decided to perform a C-section by 7:27 p.m., so that there would have been no forceps delivery and, consequently, no permanent neurological injuries. But there is no evidence that the nurses' failure to notify Dr. Finke of the 7:15 p.m. decel caused or contributed to her decision by 7:27 p.m. not to perform a C-section. In fact, Dr. Finke's testimony to the contrary, that she would not have made the decision to perform a C-section at 7:27 p.m., is undisputed.

Any negligence of the nurses in failing to recognize and take action on the baby's hypoxic events or to notify Dr. Finke of the critical 7:15 p.m. decel was too remote and attenuated by Dr. Finke's independent decision.[4] *See, e.g., Wyeth–Ayerst Labs. v. Medrano*, 28 S.W.3d 87, 95 (Tex.App.-Texarkana 2000, no pet.) (holding plaintiff failed, as matter of law, to prove lack of adequate information from manufacturer of Norplant caused her injuries where nurse practitioner testified that information would not have affected her decision to prescribe contraceptive to plaintiff); *Thomas v. Hoffman–LaRoche, Inc.*, 949 F.2d 806, 817–18 (5th Cir.1992) (applying Mississippi law) (holding regardless of plaintiff's expert's opinion that reasonable physician would not have prescribed drug

---

**3.** In their original brief as appellants, the nurses raised complaints of no evidence of causation regarding the claims of negligence now relied upon by the majority, including failing to chart events occurring during labor and delivery or by failing to intervene with appropriate measures during labor. Plaintiffs did not respond to those arguments but, instead, focused in this court solely on the theory that the nurses failed to prevent the forceps delivery. Plaintiffs have thus abandoned their theories of liability based upon the grounds of negligence urged by the majority. *See Wells Fargo Bank Tex., N.A. v. Barton*, 100

S.W.3d 455, 458 (Tex.App.-San Antonio 2003, no pet.); *In re J.G.W.*, 54 S.W.3d 826, 832 (Tex.App.-Texarkana 2001, no pet.).

**4.** Although Nurse LaMont testified that the nurses should have "pushed" Dr. Finke into a decision, Plaintiffs concede they are not contending that the nurses should have insisted that Dr. Finke perform a C-section, rather than proceeding to a forceps vaginal delivery. Indeed, Nurse LaMont admitted she was not suggesting that they should have told Dr. Finke what decision to make.

if earlier adequate warning had been given, "undisputed historical evidence" that no physician changed his or her practice after adequate information was released by manufacturer precluded reasonable possibility that adequate warning would have prevented plaintiff's injury, and possibility that defendant physician would not have prescribed drug too remote to raise issue of fact as to causation).

The overarching question with respect to the nurses' liability is whether some evidence establishes a reasonable medical probability that one or more specific breaches of the standard of care by the nurses alleged and proved was a "substantial factor" in bringing about Madeline's injuries, and "without which her injuries would not have occurred." *See Lear Siegler, Inc. v. Perez*, 819 S.W.2d 470, 472 (Tex.1991); *see also Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 477 (Tex.1995). Any negligence of the nurses was too attenuated from the resulting injuries to be a substantial factor without which the injuries would not have occurred.

Plaintiffs' theory, as accepted by the majority, is that if there had been a C-section delivery then there would have been no forceps delivery and, hence, no birth trauma. This is not enough. "In order to be [the proximate cause] of another's harm, it is not enough that the harm would not have occurred had the actor not been negligent.... [T]his is necessary, but is not of itself sufficient. The negligence must also be a *substantial factor* in bringing about the plaintiff's harm." (emphasis added.) *IHS Cedars Treatment Ctr. of Desoto v. Mason*, 143 S.W.3d 794, 799

(Tex.2004) (quoting RESTATEMENT (SECOND) OF TORTS § 431, cmt. a (1965)); *see also Union Pump Co. v. Allbritton*, 898 S.W.2d 773, 775 (Tex.1995); *Lear Siegler, Inc.*, 819 S.W.2d at 472.[5]

To sum up, there is no evidence in this case that if the nurses had acted differently, the result would have been different. *See Lenger*, 455 S.W.2d at 706. Absent such evidence, the jury was left to speculate that the nurses' conduct caused Madeline's injuries. *See id.* I would hold, therefore, that there is legally insufficient evidence that any negligence of the nurses was a cause-in-fact of Madeline's injuries and damages.

## CONCLUSION

Our sympathies are naturally with this family who must live with the tragedy and burdens of a child with cerebral palsy and mental retardation. But it is not for this court, under the guise of the deferential standard of review favoring the jury's findings, to re-invent the case that was tried. The record compels the conclusion that there is legally insufficient evidence to support the jury's finding of causation as to any negligence of the nurses or Dr. Finke. Consequently, I would reverse and render judgment that Appellants and Cross–Appellees Robert and Donna Morrell, individually, and as next friends for the minor daughter, Madeline Morrell, take nothing against all defendants.

CAYCE, C.J., joins.

5. The Restatement uses the word "cause" in "the popular sense, in which there always lurks the idea of responsibility, rather than in the so-called 'philosophic sense,' which includes every one of the great number of events without which any happening would not have occurred. Each of these events is a cause in the so-called 'philosophic sense,' yet the effect of many of them is so insignificant that no ordinary mind would think of them as causes." *Lear Siegler, Inc.*, 819 S.W.2d at 472 (quoting from RESTATEMENT (SECOND) OF TORTS, § 431, cmt. a).